FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS

05/7/2015 12:53:18 AM

KEITH E. HOTTLE
Clerk

# APPENDIX B

# IN THE SUPREME COURT OF TEXAS

══════════
No. 13-0605
══════════

BROWN & GAY ENGINEERING, INC., PETITIONER,

v.

ZULEIMA OLIVARES, INDIVIDUALLY AND AS THE REPRESENTATIVE OF THE
ESTATE OF PEDRO OLIVARES, JR., & PEDRO OLIVARES, RESPONDENTS

══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
══════════════════════════════════════════════════

**Argued October 15, 2014**

JUSTICE LEHRMANN delivered the opinion of the Court, in which JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE BOYD, and JUSTICE DEVINE joined.

CHIEF JUSTICE HECHT filed an opinion concurring in the judgment, in which JUSTICE WILLETT and JUSTICE GUZMAN joined.

JUSTICE BROWN did not participate in the decision.

The doctrine of sovereign immunity bars suit against the government absent legislative consent. In this case, a private engineering firm lawfully contracted with a governmental unit to design and construct a roadway, and a third party sued the firm for negligence in carrying out its responsibilities. The firm filed a plea to the jurisdiction seeking the same sovereign-immunity protection that the governmental unit would enjoy had it performed the work itself. The trial court

granted the plea, but the court of appeals reversed, holding that the firm was not immune from suit. We hold that extending sovereign immunity to the engineering firm does not serve the purposes underlying the doctrine, and we therefore decline to do so. Accordingly, we affirm the court of appeals' judgment.

## I. Background

During the early hours of January 1, 2007, an intoxicated driver entered an exit ramp of the Westpark Tollway in Fort Bend County. He proceeded east in the westbound lanes for approximately eight miles before colliding with a car driven by Pedro Olivares, Jr. Both drivers were killed.

The Fort Bend County portion of the Tollway fell under the purview of the Fort Bend County Toll Road Authority, a local government corporation created to design, build, and operate the Tollway. Rather than utilize government employees to carry out its responsibilities, the Authority entered into an Engineering Services Agreement with Brown & Gay Engineering, Inc. pursuant to Texas Transportation Code section 431.066(b), which authorizes local government corporations to retain "engineering services required to develop a transportation facility or system." Under that agreement, the Authority delegated the responsibility of designing road signs and traffic layouts to Brown & Gay, subject to approval by the Authority's Board of Directors.[1] Brown & Gay was contractually responsible for furnishing the necessary equipment and personnel to perform its duties and was required to maintain insurance for the project, including workers' compensation,

---

[1] The Authority maintained no full-time employees.

2

commercial general liability, business automobile liability, umbrella excess liability, and professional liability.

Olivares's mother, individually and as representative of his estate, and his father sued the Authority and Brown & Gay, among others,[2] alleging that the failure to design and install proper signs, warning flashers, and other traffic-control devices around the exit ramp where the intoxicated driver entered the Tollway proximately caused Olivares's death. The Authority filed a plea to the jurisdiction on governmental-immunity grounds. The trial court denied the plea, but on interlocutory appeal the court of appeals reversed, holding that the Authority was immune from claims based on its discretionary acts related to the placement and sufficiency of signs and other traffic-control and traffic-safety devices. *Fort Bend Cnty. Toll Road Auth. v. Olivares*, 316 S.W.3d 114, 121–26 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The court of appeals remanded the case to the trial court to give the Olivareses an opportunity to amend their pleadings. *Id.* at 129. On remand, the Olivareses nonsuited the Authority, whose immunity is no longer at issue in this proceeding.

Brown & Gay then filed its own plea to the jurisdiction, arguing that it was an employee of the Authority being sued in its official capacity and was therefore entitled to governmental immunity. *See Tex. Adjutant General's Office v. Ngakoue*, 408 S.W.3d 350, 356 (Tex. 2013) (explaining that a suit against a government official acting in an official capacity is "merely another way of pleading an action against the entity of which the official is an agent" (internal quotation marks and citation

---

[2] The Olivareses initially sued the Authority, Harris County, Fort Bend County, the Texas Department of Transportation, and the Harris County Toll Road Authority. They amended their petition to add Brown & Gay and Michael Stone Enterprises, Inc. as defendants. Harris County, Fort Bend County, TxDOT, and the Harris County Toll Road Authority have all been nonsuited. Stone Enterprises is not a party to the petition for review filed in this Court.

3

omitted)). The trial court granted the plea, but the court of appeals reversed, holding that Brown & Gay was not entitled to governmental immunity because it was an independent contractor, not an "employee" of the Authority as that term is defined in the Texas Tort Claims Act.[3] 401 S.W.3d 363, 378–79 (Tex. App.—Houston [14th Dist.] 2013).

In this Court, Brown & Gay argues that its status as an independent contractor rather than a government employee does not foreclose its entitlement to the same immunity afforded to the Authority. It argues that the court of appeals' reliance on the Tort Claims Act was misplaced because the Act "uses 'employee' to delineate the circumstances where the government will be liable under a waiver of immunity," not "to limit the scope of . . . unwaived governmental immunity." Brown & Gay further argues that the purposes of sovereign immunity are served by extending it to private entities performing authorized governmental functions for which the government itself would be immune.

## II. Analysis

### A. Origin and Purpose of Sovereign Immunity

Once again we are presented with questions about the parameters of sovereign immunity, the well-established doctrine "that 'no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent.'" *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (quoting *Hosner v. DeYoung*, 1 Tex. 764, 769 (1847)). While sovereign immunity developed

---

[3] The Tort Claims Act defines "employee" as "a person, including an officer or agent, who is in the paid service of a governmental unit by competent authority, but does not include an independent contractor, an agent or employee of an independent contractor, or a person who performs tasks the details of which the governmental unit does not have the legal right to control." TEX. CIV. PRAC. & REM. CODE § 101.001(2).

as a common-law doctrine, we "have consistently deferred to the Legislature to waive such immunity." *Reata Constr. Corp. v. City of Dall.*, 197 S.W.3d 371, 375 (Tex. 2006) (emphasis omitted). Referred to as governmental immunity when applied to the state's political subdivisions,[4] *Travis Cent. Appraisal Dist. v. Norman*, 342 S.W.3d 54, 57–58 (Tex. 2011), sovereign immunity encompasses both immunity from suit and immunity from liability, *Reata Constr. Corp.*, 197 S.W.3d at 374. Immunity from liability is an affirmative defense that bars enforcement of a judgment against a governmental entity, while immunity from suit bars suit against the entity altogether and may be raised in a plea to the jurisdiction. *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009); *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 696 (Tex. 2003).

Although the doctrine's origins lie in the antiquated "feudal fiction that 'the King can do no wrong,'" modern-day justifications revolve around protecting the public treasury. *Taylor*, 106 S.W.3d at 695. At its core, the doctrine "protects the State [and its political subdivisions] from lawsuits for money damages" and other forms of relief, and leaves to the Legislature the determination of when to allow tax resources to be shifted "away from their intended purposes toward defending lawsuits and paying judgments." *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 853–54 (Tex. 2002) (plurality op.); *see also Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam) (noting that sovereign immunity "shield[s] the state from lawsuits seeking other forms of relief," not just suits seeking money judgments). And while inherently connected to the protection of the public fisc, sovereign immunity preserves separation-of-

---

[4] We will use the term sovereign immunity throughout the remainder of the opinion to refer to both doctrines.

powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars. *See Rusk State Hosp. v. Black*, 392 S.W.3d 88, 97 (Tex. 2012) (noting that immunity respects "the relationship between the legislative and judicial branches of government"); *see also Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 414 (Tex. 1997) (Hecht, J., concurring) (outlining modern political and financial justifications for sovereign immunity).

Sovereign immunity thus protects the public as a whole by preventing potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation. It also recognizes that the Legislature has the responsibility to determine how these public funds will be spent. But with this benefit comes a significant cost: in "shield[ing] the public from the costs and consequences of improvident actions of their governments," *Tooke*, 197 S.W.3d at 332, sovereign immunity places the burden of shouldering those "costs and consequences" on injured individuals. *See Bacon v. Tex. Historical Comm'n*, 411 S.W.3d 161, 172 (Tex. App.—Austin 2013, no pet.) (noting that "sovereign immunity generally shields our state government's improvident acts—however improvident, harsh, unjust, or infuriatingly boneheaded these acts may seem" (internal quotation marks and citation omitted)). And it does so by foreclosing—absent a legislative waiver—the litigation and judicial remedies that would be available to the injured person had the complained-of acts been committed by private persons. *Id.*

In this case, we do not consider whether a governmental unit is immune from suit or whether the government's immunity has been waived. Instead, a private company that performed allegedly negligent acts in carrying out a contract with a governmental unit seeks to invoke the same immunity

6

that the government itself enjoys. With the considerations outlined above in mind, we examine the parties' arguments.

## B. Effect of Statutes Extending or Limiting Immunity

Notwithstanding the doctrine's judicial origins, both parties argue in part that the Legislature has resolved whether to extend sovereign immunity to a private contractor like Brown & Gay. Brown & Gay cites a statute that explicitly prohibits private parties that contract with the government to finance, construct, operate, maintain, or manage correctional facilities from claiming sovereign immunity in a suit arising from services under the contract. TEX. GOV'T CODE §§ 495.001, .005.[5] Brown & Gay infers from this provision that sovereign immunity extends to private entities contracting to perform government functions, unless otherwise provided by statute. We disagree. The fact that a statute recognizes that private contractors are not entitled to sovereign immunity under certain circumstances does not imply that such entities are entitled to immunity in all other situations.

On the other hand, the Olivareses contend that affirmative statutory extensions of immunity to private contractors in some instances demonstrate legislative intent to foreclose such immunity absent a specific legislative grant. For example, the Transportation Code provides that an independent contractor of a regional transportation authority that "performs a function of the authority or [certain other specified entities] is liable for damages only to the extent that the authority or entity would be liable" for performing the function itself. TEX. TRANSP. CODE § 452.056; *see also*

---

[5] "A private vendor operating under a contract authorized by this subchapter may not claim sovereign immunity in a suit arising from the services performed under the contract by the private vendor or county." TEX. GOV'T CODE § 495.005.

*id.* § 452.0561 (extending the same immunity to independent contractors of certain statutory transportation entities). The Olivareses argue that the absence of similar legislation applicable to contractors of local government corporations like the Authority evinces legislative intent to deprive such contractors of immunity. That may be the case, but it does not answer the question before us.

Sovereign immunity is a common-law creation, and "it remains the judiciary's responsibility to define the boundaries of the . . . doctrine and to determine under what circumstances sovereign immunity exists in the first instance." *Reata Constr. Corp.*, 197 S.W.3d at 375. By contrast, as noted above, the Legislature determines when and to what extent to waive that immunity. *Id.* Accordingly, the absence of a statutory grant of immunity is irrelevant to whether, as a matter of common law, the boundaries of sovereign immunity encompass private government contractors exercising their independent discretion in performing government functions.[6] For the reasons discussed below, we hold that they do not.

### C. Sovereign Immunity and Private Contractors

#### 1. Extending Sovereign Immunity to Brown & Gay Does Not Further the Doctrine's Rationale and Purpose

Guiding our analysis of whether to extend sovereign immunity to private contractors like Brown & Gay is whether doing so comports with and furthers the legitimate purposes that justify this otherwise harsh doctrine. Brown & Gay contends that extending immunity serves these purposes. We disagree.

---

[6] To that end, Brown & Gay is correct that the Tort Claims Act does not create sovereign immunity; it "provides a limited waiver" of that immunity. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004).

Seizing on the general purpose of protecting the public fisc, Brown & Gay argues that immunity for government contractors will save the government money in the long term. More specifically, while Brown & Gay recognizes that its exposure to defense costs and a money judgment will not affect the Tollway project's cost to the government, Brown & Gay asserts that the increased costs generally associated with contractors' litigation exposure will be passed on to the government, resulting in higher contract prices and government expense. Citing the same rationale, an amicus brief urges us to adopt a framework that would extend sovereign immunity to a private entity performing discretionary government work, so long as the contractor is authorized to do so and the government would be immune had it performed the work itself. In proposing this test, the amicus contends that, just as sovereign immunity has been extended to political subdivisions performing governmental functions, it should be extended to private entities authorized to perform those functions.

As an initial matter, we note that Brown & Gay cites no evidence to support its proposed justification and ignores the many factors at play within the highly competitive world of government-contract bidding. It also disregards the fact that private companies can and do manage their risk exposure by obtaining insurance, as Brown & Gay did in this case. But even assuming that holding private entities liable for their own negligence in fact makes contracting with those entities more expensive for the government, this argument supports extending sovereign immunity to these contractors only if the doctrine is strictly a cost-saving measure. It is not.

Sovereign immunity has never been defended as a mechanism to avoid any and all increases in public expenditures. Rather, it was designed to guard against the "unforeseen expenditures"

9

associated with the government's defending lawsuits and paying judgments "that could hamper government functions" by diverting funds from their allocated purposes. *Sefzik*, 355 S.W.3d at 621; *IT-Davy*, 74 S.W.3d at 853. Immunizing a private contractor in no way furthers this rationale. Even if holding a private party liable for its own improvident actions in performing a government contract indirectly leads to higher overall costs to government entities in engaging private contractors, those costs will be reflected in the negotiated contract price. This allows the government to plan spending on the project with reasonable accuracy.

By contrast, immunizing the government—both the State and its political subdivisions—from suit directly serves the doctrine's purposes because the costs associated with a potential lawsuit cannot be anticipated at the project's outset. Litigation against the government therefore disrupts the government's allocation of funds on the back end, when the only option may be to divert money previously earmarked for another purpose.[7] It is this diversion—and the associated risk of disrupting government services—that sovereign immunity addresses. Accordingly, the rationale underlying the doctrine of sovereign immunity does not support extending that immunity to Brown & Gay.

### 2. Sovereign Immunity Does Not Extend to Private Companies Exercising Independent Discretion

We have never directly addressed the extension of immunity to private government contractors, but our analysis in *K.D.F. v. Rex*, 878 S.W.2d 589 (Tex. 1994), is instructive. In that case, we examined whether a private company that contracted with the Kansas Public Employees'

---

[7] As noted above, private parties like Brown & Gay have an established means of protecting themselves from the specter of costly litigation—insurance. Indeed, as noted above Brown & Gay was contractually required to, and did, purchase several categories of insurance coverage on the Tollway project. The premiums for this coverage were undoubtedly taken into account during the bidding process.

10

Retirement System, a Kansas governmental entity created to manage and invest Kansas state employees' retirement savings, could benefit from the system's sovereign immunity and take advantage of a Kansas statute that required all "actions 'directly or indirectly' against the system" to be brought in a particular county in Kansas. *Id.* at 592. *K.D.F.* required us to interpret statutory language that is not at issue here; however, in rejecting the private company's assertion that any lawsuit against it was "indirectly" a lawsuit against the system, we tellingly noted:

> While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection *ad infinitum* through nothing more than private contracts. [The private entity] is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of the Kansas government, executed subject to the control of [the system].

*Id.* at 597. In turn, we held that another private company that "operate[d] solely upon the direction of [the system]" and "exercise[d] no discretion in its activities" was indistinguishable from the system, such that "a lawsuit against one [wa]s a lawsuit against the other." *Id.* This reasoning implies that private parties exercising independent discretion are not entitled to sovereign immunity.

The control requirement discussed in *K.D.F.* is consistent with the reasoning federal courts have utilized in extending derivative immunity to federal contractors only in limited circumstances. For example, in *Butters v. Vance International, Inc.*, a female employee of a private security firm hired to supplement security at the California residence of Saudi Arabian royals sued the firm for gender discrimination after being declined a favorable assignment. 225 F.3d 462, 464 (4th Cir. 2000). Although the firm had recommended the employee for the assignment, Saudi military supervisors rejected the recommendation on the grounds that the assignment would offend Islamic law and Saudi cultural norms. *Id.* Concluding that the Saudi government would be immune from

11

suit under the Foreign Sovereign Immunities Act, the Fourth Circuit then considered whether that immunity attached to the security firm. *Id.* at 465. Holding that it did, the court relied on the fact that the firm "was following Saudi Arabia's orders not to promote [the employee]," expressly noting that the firm "would not [have been] entitled to derivative immunity" had the firm rather than the sovereign made the decision to decline the promotion. *Id.* at 466.

This limitation on the extension of immunity to government contractors is echoed in other cases. For example, in *Ackerson v. Bean Dredging LLC*, federal contractors were sued for damages allegedly caused by dredging in conjunction with the Mississippi River Gulf Outlet project. 589 F.3d 196 (5th Cir. 2009). Relying on *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18 (1940), the Fifth Circuit held that the contractors were entitled to immunity for their actions taken within the scope of their authority for the purpose of furthering the project. 589 F.3d at 206–07, 210.[8] Notably, however, the court found significant that the plaintiffs' allegations "attack[ed] Congress's policy of creating and maintaining the [project], *not any separate act of negligence by the Contractor Defendants*." *Id.* at 207 (emphasis added); *see also Yearsley*, 309 U.S. at 20 (holding that a contractor directed by the federal government to construct several dikes was immune from claims arising from the resulting erosion and loss of property when the damage was allegedly caused by the dikes' existence, not the manner of their construction).

We cited *Yearsley* in a case involving a city contractor hired to build sewer lines along a city-owned easement in accordance with the city's plans and specifications. *Glade v. Dietert*, 295

---

[8] The Fifth Circuit noted that the contractors' entitlement to dismissal was not jurisdictional. 589 F.3d at 207.

S.W.2d 642, 643 (Tex. 1956). The city had inadvertently failed to acquire the entire easement as reflected in the plans, and the contractor was sued for trespass after bulldozing a portion of a landowner's property. *Id.* While immunity was not at issue in *Glade* because the city owed the landowner compensation for a taking, we cited *Yearsley* and other case law for the proposition that a public-works contractor "is liable to third parties only for negligence in the performance of the work and not for the result of the work performed according to the contract." *Id.* at 644.

In each of these cases, the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor.[9] In this case, the Olivareses do not complain of harm caused by Brown & Gay's implementing the Authority's specifications or following any specific government directions or orders. Under the

---

[9] One federal district court aptly summarized the framework governing the extension of derivative immunity to federal contractors as follows:

> The rationale underlying the government contractor defense is easy to understand. Where the government hires a contractor to perform a given task, and specifies the manner in which the task is to be performed, and the contractor is later haled into court to answer for a harm that was caused by the contractor's compliance with the government's specifications, the contractor is entitled to the same immunity the government would enjoy, because the contractor is, under those circumstances, effectively acting as an organ of government, without independent discretion. Where, however, the contractor is hired to perform the same task, but is allowed to exercise discretion in determining how the task should be accomplished, if the manner of performing the task ultimately causes actionable harm to a third party the contractor is not entitled to derivative sovereign immunity, because the harm can be traced, not to the government's actions or decisions, but to the contractor's independent decision to perform the task in an unsafe manner. Similarly, where the contractor is hired to perform the task according to precise specifications but fails to comply with those specifications, and the contractor's deviation from the government specifications actionably harms a third party, the contractor is not entitled to immunity because, again, the harm was not caused by the government's insistence on a specified manner of performance but rather by the contractor's failure to act in accordance with the government's directives.

*Bixby v. KBR, Inc.*, 748 F. Supp. 2d 1224, 1242 (D. Or. 2010).

13

contract at issue, Brown & Gay was responsible for preparing "drawings, specifications and details for all signs." Further, the Olivareses do not complain about the decision to build the Tollway or the mere fact of its existence, but that Brown & Gay was independently negligent in designing the signs and traffic layouts for the Tollway. Brown & Gay's decisions in designing the Tollway's safeguards are its own.[10]

Similar principles have been echoed in Texas appellate court decisions, cited by Brown & Gay, addressing the extension of immunity to private agents of the government. Two of these cases extended immunity to private law firms hired to assist the government with collecting unpaid taxes. *Ross v. Linebarger, Goggan, Blair & Sampson, L.L.P.*, 333 S.W.3d 736 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *City of Hous. v. First City*, 827 S.W.2d 462 (Tex. App.—Houston [1st Dist.] 1992, writ denied). In *City of Houston*, the court of appeals engaged in a traditional principal–agency analysis to hold that the law firm was not liable as the city's agent on the plaintiff's claim that the city breached an "accord and satisfaction." 827 S.W.2d at 479–80. In contrast, the Olivareses do not assert that Brown & Gay is liable for the Authority's actions; they assert that Brown & Gay is liable for its own actions.

In *Ross*, the court of appeals held that the law firm was the "equivalent of a state official or employee" being sued in its official capacity. 333 S.W.3d at 742–43. But Brown & Gay has notably abandoned the very argument that the case would seem to support: that the Olivareses sued Brown & Gay as a government employee in its official capacity and therefore effectively sued the

---

[10] At oral argument, Brown & Gay's counsel recognized that the details of the Tollway project, or the "discretionary functions" as put by counsel, were delegated to Brown & Gay.

14

government. Moreover, in determining whether the law firm was the equivalent of a state official in *Ross*, the court of appeals examined the pleadings to conclude that the plaintiff had sued the law firm as an agent of the taxing entity and had "asserted no facts indicating that the taxing entities did not have the legal right to control the details of the tax-collecting task delegated to [the firm]." *Id.*

Regardless of whether these cases were correctly decided, the government's right to control that led these courts to extend immunity to a private government contractor is utterly absent here. The evidence shows that Brown & Gay was an independent contractor with discretion to design the Tollway's signage and road layouts. We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative.[11]

Finally, Brown & Gay cites *Foster v. Teacher Retirement System*, 273 S.W.3d 883 (Tex. App.—Austin 2008, no pet.), to support the extension of immunity in this case. In that case, a retired teacher sued the Teacher Retirement System of Texas (a state agency) as well as Aetna, the private company hired to administer the agency's insurance plan. *Id.* at 885. The suit arose from Aetna's denial of health coverage on a claim after concluding that the provider was not in-network and the treatment was not medically necessary. *Id.* The court of appeals held that both the agency and Aetna were immune from suit for claims arising out of the coverage denial. *Id.* at 890. However, the terms

---

[11] The amicus asserts that "no policy reason" supports employing a control-oriented analysis. In doing so, the amicus implicitly recognizes that policy concerns are central to deciding whether immunity should be extended. As discussed at length above, the policy behind immunity does not support its extension here regardless of whether a control-oriented analysis applies.

15

of the contract, the relationship between the state agency and the contractor, and the direct implication of state funds in that case distinguish it from the case at hand.

In *Foster*, the court of appeals recognized that Aetna had discretion to interpret the insurance plan, but explained that, under the contract with the agency, "Aetna simply provide[d] administrative services to facilitate the provision of health care to [covered] retirees." *Id.* Further, the insurance plan was fully funded by the state such that Aetna had no stake in a claim's approval or denial, the agency set the terms of the plan, Aetna acted as an agent of and in a fiduciary capacity for the agency, and the agency agreed to indemnify Aetna for any obligations arising out of its good-faith performance. *Id.* at 889–90. The court compared Aetna to the "fiduciary intermediaries" discussed in federal case law holding that "a private company is protected by Eleventh Amendment immunity if the suit amounts to one seeking to recover money from the state." *Id.* at 889 (citing cases). In this case, no fiduciary relationship exists between Brown & Gay and the Authority. Further, in suing Brown & Gay the Olivareses do not effectively seek to recover money from the government. Unlike the coverage claims in *Foster*, which implicated both the state-funded insurance plan and the agency's duty to indemnify Aetna, the underlying suit threatens only Brown & Gay's pockets.

In sum, we cannot adopt Brown & Gay's contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority was statutorily authorized to engage Brown & Gay's services and would have been immune had it performed those services itself. That is, we decline to extend to private entities the same immunity the government enjoys for reasons unrelated to the rationale that justifies such immunity in the first place. The Olivareses' suit does not threaten allocated government funds and does not seek to hold Brown & Gay liable merely for

16

following the government's directions.  Brown & Gay is responsible for its own negligence as a cost of doing business and may (and did) insure against that risk, just as it would had it contracted with a private owner.

## D. Justifications for Qualified and Official Immunity Do Not Support the Extension of Sovereign Immunity to Private Parties

In addition to the cost-saving rationale discussed above, Brown & Gay cites the U.S. Supreme Court's opinion in *Filarsky v. Delia* to argue that extending sovereign immunity to government contractors advances the government interest in avoiding "unwarranted timidity" on the part of those performing public duties.  132 S. Ct. 1657, 1665 (2012).  The issue in *Filarsky* was whether individuals hired to do government work "on something other than a permanent or full-time basis" enjoyed the same qualified immunity as traditional government employees from claims brought against them under 42 U.S.C. § 1983.  *Id.* at 1660.  The Supreme Court held that a private attorney engaged by a city to investigate a personnel matter could assert qualified immunity in a suit alleging constitutional violations committed during the course of the investigation.  *Id.* at 1661, 1667–68.  The Court saw no basis to distinguish between a full-time government employee, who would be entitled to assert such immunity, and an individual hired to do government work on some other basis.  *Id.*

Brown & Gay's reliance on *Filarsky*'s qualified-immunity analysis is misplaced.  The federal doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting

17

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Unlike sovereign immunity, qualified immunity does not protect the government's tax-funded coffers from lawsuits and money judgments. Rather, it protects government officials' personal coffers by "shield[ing] officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

Qualified immunity is a uniquely federal doctrine, calling into further doubt *Filarsky*'s relevance to the issue in this case. At best, the doctrine bears some resemblance to the Texas common-law defense of official immunity, which protects government officers from personal liability in performing discretionary duties in good faith within the scope of their authority.[12] *Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994); *see also Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004) ("Common law official immunity is based on the necessity of public officials to act in the public interest with confidence and without the hesitation that could arise from having their judgment continually questioned by extended litigation."). In *Kassen*, we noted the well-established distinction between "official immunity, which protects individual officials from liability, [and] sovereign immunity, which protects governmental entities from liability." 887 S.W.2d at 8. We also recognized that a government employee's right to official immunity is unrelated to a plaintiff's right to pursue the government under a legislative waiver of sovereign immunity. *Id.* Further, unlike sovereign immunity from suit, which as noted above may be raised in a plea to the jurisdiction, official immunity is an affirmative defense that must be pled and proved by the party asserting it. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994).

---

[12] In *City of Lancaster v. Chambers*, we noted that federal law on qualified immunity was instructive in evaluating whether a police officer was entitled to official immunity for his actions in conducting a high-speed chase. 883 S.W.2d 650, 654 (Tex. 1994).

In this case, Brown & Gay has never argued that the official-immunity defense may be asserted by a person performing government work "on something other than a permanent or full-time basis." *Filarsky*, 132 S. Ct. at 1660. Nor has it ever pled or argued that the elements of the defense are satisfied here. Instead, Brown & Gay argues that it is entitled to the same immunity that the government itself enjoys. But the policies underlying official and qualified immunity are simply irrelevant to that contention.

Brown & Gay also argues that declining to extend sovereign immunity to contractors like Brown & Gay will make it difficult for the government to engage talented private parties fearful of personal liability. As noted above, such speculation fails to take into account a private party's ability to manage that liability exposure through insurance. It also ignores the countervailing considerations that make contracting with the government attractive, not the least of which is lack of concern about the government's ability to pay.

Moreover, a long line of Texas case law recognizes government contractors' liability for their negligence in road and highway construction. *See, e.g.*, *Bay, Inc. v. Ramos*, 139 S.W.3d 322, 328 (Tex. App.—San Antonio 2004, pet. denied) (holding that a government contractor hired for highway construction work was not entitled to share in the state's sovereign immunity when the contractor exercised considerable discretion in maintaining the construction site where the plaintiff's injury occurred); *Overstreet v. McClelland*, 13 S.W.2d 990, 992 (Tex. Civ. App.—Amarillo 1928, writ dism'd w.o.j.) (holding that a government contractor hired for highway construction work had a duty to exercise ordinary care to protect travelers using the highway despite the fact that the government itself could not be held liable for the negligence of its officers or agents); *cf. Strakos v.*

19

*Gehring*, 360 S.W.2d 787, 790, 793–94 (Tex. 1962) (holding, in the context of rejecting the "accepted work" doctrine, that a county contractor hired to relocate fencing alongside widened roads was not insulated from tort liability for injuries that occurred after the county accepted the work but were caused by the condition in which the contractor left the premises).  Brown & Gay cites no evidence supporting a shortage of willing contractors notwithstanding this line of cases.

### III. Conclusion

We decline to extend sovereign immunity to private contractors based solely on the nature of the contractors' work when the very rationale for the doctrine provides no support for doing so. We hold that the trial court erred in granting Brown & Gay's plea to the jurisdiction and that the court of appeals properly reversed that order.  Accordingly, we affirm the court of appeals' judgment.

_____
Debra H. Lehrmann
Justice

**OPINION DELIVERED:** April 24, 2015