**AFFIRM; and Opinion Filed July 21, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-15-01559-CV

### DAWN NETTLES, Appellant
### V.
### GTECH CORPORATION, Appellee

**On Appeal from the 160th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-14-14838**

## MEMORANDUM OPINION
Before Justices Lang-Miers, Myers, and Richter[1]
Opinion by Justice Richter

Appellant Dawn Nettles sued appellee GTECH Corporation, a private contractor, for

fraud in the sale of a Texas Lottery scratch-off ticket called "Fun 5's." The trial court granted

GTECH's plea to the jurisdiction and dismissed Nettles's suit. In this appeal, we consider

whether derivative sovereign immunity bars Nettles's claims against GTECH. We conclude that

it does, and affirm the trial court's order granting GTECH's plea.

### BACKGROUND

#### A. Nettles's claims

Nettles purchased tickets in the Texas Lottery's "Fun 5's" scratch-off game. The tickets

included a tic-tac-toe game containing a three-by-three grid of symbols, a "prize box," and a box

---

[1] The Honorable Martin Richter, Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment.

labeled "5X," known as a "multiplier." Nettles contends that the instructions on the tickets misled her to believe that she would win five times the amount in the tickets' prize box, when in fact her tickets were "non-winning."

Nettles alleges the instructions described two ways to win five times the amount in the prize box, by either (1) matching three symbols in a row, column, or diagonal in the grid, or (2) finding a "money bag" symbol in the multiplier box. The tickets, however, were non-winning unless both of these conditions were met. On some of the tickets Nettles purchased, one or the other of the conditions was met, but not both. When she learned that her tickets were non-winning, Nettles sued GTECH for an amount in excess of $4,000,000 that she alleges she should have won.

## B. The Texas Lottery and GTECH

The Texas Lottery is owned and operated by the Texas Lottery Commission ("TLC"), a state agency. The TLC and its executive director "have broad authority and shall exercise strict control and close supervision over all lottery games conducted in this state to promote and ensure integrity, security, honesty, and fairness in the operation and administration of the lottery." TEX. GOV'T CODE ANN. § 466.014(a) (West Supp. 2016). By statute, the executive director of the TLC "shall prescribe the form of tickets." TEX. GOV'T CODE ANN. § 466.251(a) (West 2012).

GTECH[2] is the United States subsidiary of an Italian gaming company which operates lotteries, sports betting, and commercial bookmaking throughout the world. On December 14, 2010, TLC and GTECH executed a "Contract for Lottery Operations and Services" (the "Operations Contract") that gives GTECH the exclusive right to operate the Texas Lottery through 2020. According to the Operations Contract, GTECH is an independent contractor and

---

[2] The record reflects that GTECH is now known as "IGT Global Solutions Corporation." The parties' briefs, however, refer to appellee as "GTECH."

not an employee or agent of the TLC. In the "warranties" section, the Operations Contract provides:

> GTECH warrants and agrees that its tickets, games, goods and services shall in all respects conform to, and function in accordance with, Texas Lottery-approved specifications and designs.

Section 3.33.1 of the Operations Contract provides in relevant part, "GTECH shall indemnify, defend and hold the Texas Lottery, its commission members, [and] the State of Texas . . . harmless from and against any and all claims . . . arising out of a Claim for or on account of the Works, or other goods, services, or deliverables provided as the result of this Contract . . . ." Section 3.34 of the Operations Contract addresses requirements for bonds and insurance. Among other coverages, GTECH must maintain general liability insurance and errors and omissions insurance.

In her operative petition, Nettles cites to a "Request for Proposals for Instant Ticket Manufacturing and Services" available on the TLC's website, alleging that "GTECH is obligated, under Section 7.8 of the Instant Ticket RFP to provide working papers for each instant game and is further obligated to provide executed working papers that 'must be complete and free from any errors.'" Joseph Lapinski, an account development manager for GTECH, also testified that GTECH submits "draft working papers" to the TLC containing specifications for proposed scratch-off tickets, including the design, artwork, prize structures, and rules of the game. Lapinski also testified that the TLC then notifies GTECH of any desired changes to the working papers.

## C. Development of the Fun 5's game

In March 2013, GTECH made a presentation to the TLC, providing examples of scratch-off games that had been successful in other states. The TLC selected the Fun 5's game as one of

–3–

the scratch-off games it intended to purchase from GTECH for use during fiscal year 2014. Although the Fun 5's game ticket included five different games, only Game 5 is at issue here.

Penny Whyte, GTECH's customer service representative, prepared the initial draft of the working papers for the Fun 5's game. Whyte testified that before the draft was sent to the TLC, GTECH undertook an internal review of the artwork, instructions, and parameters for the game. Lapinski testified that initial draft working papers were based on the game that GTECH had operated in other states. He explained that the instructions for the game in the initial draft working papers were based on a game used in Nebraska. The instructions for Game 5 provided:

> Reveal three Dollar Bill [graphic of symbol] symbols in any one row, column, or diagonal line, win PRIZE in PRIZE box. Reveal a "5" symbol in the 5X BOX, win 5 times that PRIZE.

Gary Grief, the Executive Director of the TLC, testified that because GTECH has "experience in the industry," the TLC "do[es] rely on them, at least as a starting point, when we're looking at language that goes on tickets." He agreed that he expected GTECH to exercise reasonable care to propose language that is not misleading.

Lapinski testified that after the working papers were submitted to the TLC, the TLC requested changes to Game 5. First, the TLC requested that the "5" symbol be changed to a "Money Bag" symbol. Second, the TLC requested that the "Dollar Bill" symbol be changed to a "5" symbol. Third, the TLC requested that GTECH change the parameters of Game 5. In an email marked "High Importance" from Jessica Burrola, an Instant Product Specialist for the TLC, to Laura Thurston, a client services representative of GTECH, the TLC instructed:

> Game #5: Game parameters #33 and #34 (see below) mention the money bag symbol as only appearing on winning tickets. This would make it an easy target for micro-scratching since only the rest of game 5 would not have to be micro-scratched to know that it is a winner. We would prefer to have the money bag symbol appear on non-winning tickets, too.

Walter Gaddy, a Regional Sales Manager for GTECH, explained in an affidavit that:

> The TLC ordered this change as a security measure against "micro-scratching." Micro-scratching consists of someone using a small sharp object to unveil a microscopic portion of the play area of the scratch ticket to discern whether a ticket is a winner or a non-winner in a way that is largely undetectable. If the Money Bag symbol only appeared on winning tickets, this might make the game an easy target for micro-scratching since only the rest of Game 5 would not have to be micro-scratched to know that it is a winner.

Gaddy also testified that "[u]pon the instructions of the TLC, GTECH incorporated the TLC's changes to the game's parameters and programmed its computers so that 25% of the tickets that had not won the tic-tac-toe game would reveal a Money Bag Play symbol in the 5X box."

GTECH then prepared a set of final working papers for the TLC's approval. In accordance with the TLC's instructions, a "money bag" symbol appeared on approximately 25% of the non-winning tickets, and the rules for Game 5 read:

> Reveal three "5" symbols in any one row, column or diagonal, win PRIZE in PRIZE box. Reveal a Money Bag "[graphic of symbol]" in the 5X BOX, win 5 times that prize.

In her operative petition, Nettles alleges that on May 16, 2014, TLC Executive Director Grief "executed the final working papers and approved the Fun 5's game as proposed by GTECH." Nettles's operative pleading also acknowledges that the parameters of the game were changed "[a]t the request of the TLC."

Nettles elicited testimony from both GTECH and TLC witnesses that she relies on to support her allegations that it was GTECH's responsibility to (1) check the parameters of the game in the working papers, (2) conduct a comprehensive review of the game's instructions to make sure that the change in parameters requested by the TLC did not require a change in the language of the game's instructions, (3) compare the language on the tickets to make sure it was not misleading or deceptive, and (4) make sure the final executed working papers were free of errors. She alleges that GTECH's customer service representative and software department had

–5–

the knowledge and expertise necessary to ensure that the language was clear, unambiguous, and not misleading, and that the TLC expected GTECH to exercise reasonable care in doing so. And she contends that Thurston and Whyte, both of GTECH, were the decision-makers "that GTECH would not change the wording of the instructions to make them less misleading or deceptive."

Nettles also alleges in her operative petition that GTECH and the TLC began to receive complaints about the Fun 5's tickets from retailers and players almost immediately after sales began on September 2, 2014.[3] The complaints arose from confusion about the presence of the money bag symbol on non-winning tickets and the accompanying instructions. Sales of the tickets were discontinued by the TLC on October 21, 2014.

## D. Trial court disposition

Nettles added the TLC as a defendant in her second amended petition. The TLC and GTECH filed pleas to the jurisdiction. The trial court granted both pleas and dismissed the case. Nettles filed this appeal complaining of both rulings, but later moved to dismiss her appeal as to the TLC. This Court granted Nettles's motion on May 23, 2016, and this appeal has proceeded as to GTECH only.

## ISSUES

In one issue with two subparts, Nettles contends the trial court erred by granting GTECH's plea to the jurisdiction. In subpart 1(a), Nettles contends that sovereign immunity should not be extended to GTECH because a finding of liability against GTECH will not expose the government to unforeseen expenditures. In subpart 1(b), Nettles contends that sovereign

---

[3] GTECH's brief also recites that more than 1,200 other Fun 5's ticket purchasers sued GTECH in Travis County seeking damages in excess of $500 million, plus exemplary damages. *James Steele, et al. v. GTECH Corp.*, No. D-1-GN-14-005114 (201st Judicial District Court of Travis County, Texas). In that case, the trial court denied GTECH's plea to the jurisdiction. *Id.* (Amended Order Overruling Defendant GTECH Corporation's First Amended Plea to the Jurisdiction, Mar. 28, 2016). GTECH's appeal of that ruling is pending. *GTECH Corp. v. James Steele, et al.*, No. 03-16-00172-CV (Tex. App.—Austin) (submitted Oct. 26, 2016).

immunity should not be extended to GTECH because GTECH exercised independent discretion with respect to the design of the Fun 5's game.

## STANDARD OF REVIEW

A plea to the jurisdiction is a dilatory plea that seeks dismissal of a case for lack of subject matter jurisdiction. *Harris Cty. v. Sykes*, 136 S.W.3d 635, 638 (Tex. 2004). Whether the trial court has subject matter jurisdiction is a question of law that we review de novo. *Klumb v. Houston Mun. Emps. Pension Sys.*, 458 S.W.3d 1, 8 (Tex. 2015). When the plea to the jurisdiction challenges the existence of jurisdictional facts, we consider the relevant evidence submitted by the parties when it is necessary to resolve the jurisdictional issue. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 227 (Tex. 2004). This procedure generally mirrors that of a summary judgment under rule of civil procedure 166a(c). *Id.* at 228. The plaintiff has the burden to plead facts affirmatively showing the trial court has subject matter jurisdiction. *Id.* at 226–27. The defendant then has the burden to assert and support its contention, with evidence, that the trial court lacks subject matter jurisdiction. *Id.* at 228. If it does so, the plaintiff must raise a material fact issue regarding jurisdiction to survive the plea to the jurisdiction. *Id.*

In our review, we construe the pleadings liberally in favor of the plaintiff and look to the plaintiff's intent. *Id.* at 226–27. We consider the pleadings and the evidence pertinent to the jurisdictional inquiry. *Id.* If the evidence creates a fact issue concerning jurisdiction, the plea to the jurisdiction must be denied. *Id.* at 227–28. If the evidence is undisputed or fails to raise a fact issue concerning jurisdiction, the trial court rules on the plea to the jurisdiction as a matter of law. *Id.* at 228.

ANALYSIS

Both Nettles and GTECH rely on *Brown & Gay Engineering, Inc. v. Olivares*, 461 S.W.3d 117 (Tex. 2015), in support of their arguments regarding derivative immunity. In that case, a private engineering firm (Brown & Gay) contracted with a governmental unit (the Fort Bend County Toll Road Authority) to design and construct a roadway. *Id.* at 119. Under their written agreement, the Authority delegated the responsibility of designing road signs and traffic layouts to Brown & Gay, subject to approval by the Authority's board of directors. *Id.* An intoxicated driver entered an exit ramp of the roadway (referred to by the court as "the Tollway") and collided with a car driven by Pedro Olivares, Jr., who was killed. *Id.* Olivares's parents sued the Authority and Brown & Gay, alleging that the failure to design and install proper signs, warning flashers, and other traffic-control devices around the exit ramp where the intoxicated driver entered the Tollway proximately caused Olivares's death. *Id.* at 120. Brown & Gay filed a plea to the jurisdiction alleging it was entitled to governmental immunity. *Id.* The trial court granted the plea, but the court of appeals reversed, concluding that Brown & Gay was not entitled to governmental immunity.[4] *Id.* at 119. The supreme court affirmed the court of appeals's judgment. *Id.* at 129.

In its opinion, the supreme court considered whether "a private company that performed allegedly negligent acts in carrying out a contract with a governmental unit" could "invoke the same immunity that the government itself enjoys." *Id.* at 122. The court answered this question in the negative, holding that the private company was not immune from suit for the consequences of its own actions taken in the exercise of its own independent discretion. *See id.* at 124–27. The court relied on its reasoning in *K.D.F. v. Rex*, 878 S.W.2d 589, 597 (Tex. 1994), in which it

---

[4] The court discussed the distinction between "sovereign immunity" and "governmental immunity," but then used the term "sovereign immunity" to refer to the doctrine in the remainder of its opinion, as do we. *See Brown & Gay*, 461 S.W.3d at 121 & n.4.

explained that a private entity "is not entitled to sovereign immunity protection unless it can demonstrate its actions were actions of" the government, "executed subject to the control of" the governmental entity. *K.D.F.*, 878 S.W.2d at 597. According to the court in *Brown & Gay*, *K.D.F.*'s "control requirement" is "consistent with the reasoning federal courts have utilized in extending derivative immunity to federal contractors only in limited circumstances." *Brown & Gay*, 461 S.W.3d at 124. The court explained:

> In each of these cases, the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor.

*Id.* at 125. Similarly, in Texas appellate court decisions relied on by Brown & Gay, "the government's right to control" led the courts to extend immunity to a private government contractor. *Id.* at 126.

As Chief Justice Hecht explained in his concurring opinion, governmental immunity does not protect an independent contractor unless the contractor acts "*as* the government," implementing the government's decisions. *Id.* at 129–30 (Hecht, C.J., concurring). On this point, the Chief Justice agreed with the court, which had explained that the plaintiffs did "not complain of harm caused by Brown & Gay's implementing the Authority's specifications or following any specific government directions or orders." *Id.* The court continued:

> Under the contract at issue, Brown & Gay was responsible for preparing "drawings, specifications and details for all signs." Further, the [plaintiffs] do not complain about the decision to build the Tollway or the mere fact of its existence, but that Brown & Gay was independently negligent in designing the signs and traffic layouts for the Tollway. **Brown & Gay's decisions in designing the Tollway's safeguards are its own.**

*Id.* at 126 (emphasis added).

The court in *Brown & Gay* also held that extending the government's immunity to a private contractor for actions taken in the contractor's own discretion did not further the

immunity doctrine's rationale and purpose. *Id.* at 123. The court described sovereign immunity as a "harsh doctrine" because it "foreclos[es] . . . the litigation and judicial remedies that would be available to the injured person had the complained-of acts been committed by a private person." *Id.* at 122. The court explained that the doctrine of immunity is not "strictly a cost-saving measure"; instead, the purpose of immunity is to protect the government from "unforeseen expenditures" that could "'hamper government functions' by diverting funds from their allocated purposes." *Id.* at 123 (quoting *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) (per curiam)). The higher costs of engaging private contractors who are liable for their own improvident actions are not "unforeseen" because they can be reflected in the negotiated contract price, and because private contractors "can and do manage their risk exposure by obtaining insurance." *Id.*

The court summarized its discussion of "sovereign immunity and private contractors" as follows:

> In sum, we cannot adopt Brown & Gay's contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority was statutorily authorized to engage Brown & Gay's services and would have been immune had it performed those services itself. That is, we decline to extend to private entities the same immunity the government enjoys for reasons unrelated to the rationale that justifies such immunity in the first place. The Olivareses' suit does not threaten allocated government funds **and does not seek to hold Brown & Gay liable merely for following the government's directions.** Brown & Gay is responsible for its own negligence as a cost of doing business and may (and did) insure against that risk, just as it would had it contracted with a private owner.

*Id.* at 127 (emphasis added).

Nettles contends that under the court's reasoning in *Brown & Gay*, the first question we must answer is whether her lawsuit would cause "unforeseen expenditures" that could "hamper government functions by diverting funds from their allocated purposes." *See id.* at 123. She contends that because GTECH has agreed to defend and indemnify the TLC, her suit would not cause any unforeseen expenditures. As a result, she argues, the TLC's immunity does not extend

–10–

to GTECH. In her reply brief, Nettles contends that if we conclude her lawsuit would not cause unforeseen expenditures to the TLC, we need not undertake any further analysis.[5]

GTECH in turn relies on *Brown & Gay* to argue that the controlling question is whether GTECH exercised independent discretion or whether its actions were executed subject to the control of the TLC. *See id.* at 124. GTECH contends that the decision of which Nettles complains—to include the money bag symbol on tickets in which players did not win the tic-tac-toe game—was the TLC's.

Neither the court in *Brown & Gay* nor our sister courts applying *Brown & Gay* limited their analysis to whether the extension of immunity would protect the public fisc from unforeseen expenditures. The court's opinion in *Brown & Gay* included an extensive discussion of whether sovereign immunity extends to private parties exercising independent discretion. *See id.* at 124–27. Similarly, courts relying on *Brown & Gay* have considered both the purposes of sovereign immunity and the independent discretion of the defendant contractor.

In *Lenoir v. U.T. Physicians*, 491 S.W.3d 68, 87–88 (Tex. App.—Houston [1st Dist.] 2016, pet. pending) (op. on reh'g), a physicians' clinic ("UTP") contracted with the University of Texas Health Science Center at Houston ("UTHSCH"), "which has immunity from suit." *Id.* at 77. The contract "extended discretion to UTP," including management of the nursing staff and "the nurse alleged to have acted negligently in this case." *Id.* at 86. The court held that UTHSCH's immunity did not extend to UTP for the plaintiffs' claims arising from the death of a

---

[5] Again relying on *Brown & Gay*, Nettles also argues that derivative immunity does not apply because GTECH was an independent contractor, not an employee or agent of the TLC. The court's reference to whether Brown & Gay was "an independent contractor rather than a government employee," however, was in its discussion of Brown & Gay's argument in the courts below that it was an "employee" of the Authority for purposes of the Texas Tort Claims Act. *Brown & Gay*, 461 S.W.3d at 120. Here, however, GTECH does not claim statutory immunity under the Texas Tort Claims Act. Instead, it relies on common law sovereign immunity. As the court in *Brown & Gay* explained, because sovereign immunity "is a common-law creation," the "absence of a statutory grant of immunity is irrelevant" in determining its boundaries. *Id.* at 122–23.

patient and her unborn twins after receiving prenatal care at UTP. *Id.* at 72–73. The court reasoned:

> The contract evinces UTP's right to direct the nursing staff, control its compensation, and insure against professional liability for its acts. In doing so, UTP was granted discretion. It acted *for* the government—assisting in its provision of medical services and education—not *as* the government without discretion or diversion. *Cf. K.D.F.*, 878 S.W.2d at 597 ("While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection *ad infinitum* through nothing more than private contracts."). As such, immunity does not extend. *Brown & Gay*, 461 S.W.3d at 124–25 & n. 9, 126.

*Id.* at 86.

In *City of Rio Grande City v. BFI Waste Services of Texas, LP*, No. 04-15-00729-CV, 2016 WL 5112224, at *3–4 (Tex. App.—San Antonio Sept. 21, 2016, pet. filed) (mem. op.), the court affirmed the trial court's denial of pleas to the jurisdiction filed by Grande Garbage Collection Co., L.L.C. ("Grande") and Patricio Hernandez, Grande's owner (referred to collectively in the court's opinion as "the Grande Defendants"). Grande contracted with the City of Rio Grande City for solid waste disposal services. *Id.* at *1. The plaintiff (referred to in the court's opinion as "Allied") filed suit alleging breach of and interference with an existing contract under which Allied was the exclusive provider of solid waste disposal services within the City's limits. *Id.* Allied alleged that the Grande Defendants willfully and intentionally interfered with its contract with the City, among other claims. *Id.* at *3. Citing *Brown & Gay*, the court explained, "[t]he events that form the basis of Allied's allegations against the Grande Defendants were not actions the Grande Defendants took within the scope of their contract with the City for solid waste disposal services." *Id.* The court concluded:

> Extending immunity to the Grande Defendants for the commission of acts not within the scope of contracted services with the City and for which the Grande Defendants exercised independent discretion does not further the rationale supporting governmental immunity. *See Brown and Gay*, 461 S.W.3d at 123. Consequently, the Grande Defendants are not entitled to derivative immunity, and the trial court retains jurisdiction over the claims against the Grande Defendants.

–12–

*Id.* at *3–4.

In *Freeman v. American K-9 Detection Services, L.L.C.*, 494 S.W.3d 393, 396 (Tex. App.—Corpus Christi 2015, pet. pending), a military contractor ("AMK9") claimed derivative immunity in a suit involving a trained military dog that allegedly attacked the plaintiff. *Id.* at 397. The trial court granted AMK9's plea to the jurisdiction, and the plaintiff appealed. *Id.* The court of appeals reversed, concluding that AMK9 was not entitled to derivative sovereign immunity. *Id.* at 408. The court discussed *Brown & Gay*, explaining:

> In *Brown & Gay*, . . . the plaintiffs did not complain of harm caused by Brown & Gay's "implementing the Authority's specifications or following any specific government directions or orders," nor did they complain about the decision to build the roadway at issue or 'the mere fact of its existence.' [*Brown & Gay*, 461 S.W.3d at 125]. Instead, the plaintiffs argued that Brown & Gay was "independently negligent in designing the signs and traffic layouts" for the roadway. *Id.* Thus, the supreme court rejected Brown & Gay's "contention that it is entitled to share in the Authority's sovereign immunity solely because the Authority was statutorily authorized to engage Brown & Gay's services and would have been immune had it performed those services itself." *Id.* at 127.

*Id.* at 405. The court concluded that AMK9 was not derivatively immune because the plaintiff's allegations arose from AMK9's "independent acts of negligence," in violation of its contract with the military and military policy. *Id.* at 408–09.

Like the courts in *Brown & Gay*, *Lenoir*, *Rio Grande City*, and *Freeman*, we consider whether the defendant contractor met its burden to establish that it was acting *as* the government, not *for* the government, in addition to considering "protection of the public fisc." *See Brown & Gay*, 461 S.W.3d at 121, 125. The record is undisputed that Nettles's claims arise from decisions made by the TLC, not GTECH. Nettles testified:

> Q. And you know from sitting through those depositions that each of the complaints that you are making in this lawsuit about the Fun 5's game were changes that were requested by the Texas Lottery Commission, correct?

> A. Yes. I know that now. I did not know that when I bought the tickets.

Nettles contends that GTECH had an independent duty, arising under its contract with the TLC, to conduct a "comprehensive review" of the TLC's decisions to ensure that "the language [in the game's instructions] was not defective or problematic." But the contract between GTECH and the TLC does not permit GTECH to evaluate and reject the TLC's decisions. Instead, it requires that "tickets, games, goods, and services shall in all respects conform to, and function in accordance with, Texas Lottery-approved specifications and designs." Although Nettles points to testimony that GTECH's work must be "free from errors," she does not cite any evidence that GTECH's working papers erred in incorporating the TLC's decisions. In the trial court, Nettles's counsel conceded that GTECH did not "do anything contrary to what the TLC signed off on."

The record also shows that the TLC's review of GTECH's working papers was extensive and detailed. Over the course of a year, the TLC reviewed the Fun 5's games and requested the changes that are the basis for Nettles's claims. In *Brown & Gay*, in contrast, the Authority had no full-time employees; the approval of Brown & Gay's plans was made by the Authority's board of directors. *Brown & Gay*, 461 S.W.3d at 199 & n.1. There is no indication that the decisions that were the basis for the plaintiffs' claims in *Brown & Gay*—regarding the failure to design and install proper signs, warning flashers, and other traffic-control devices around the exit ramp where the intoxicated driver entered the Tollway—were made by the Authority. As the court explained, "the Olivarises do not assert that Brown & Gay is liable for the Authority's actions; they assert that Brown & Gay is liable for its own actions." *Id.* at 126. Here, after detailed review and required modifications, the TLC approved GTECH's final working papers. We conclude that GTECH met its burden to establish that it was acting as the TLC, not exercising independent discretion, in making the changes to the Fun 5's tickets that are the basis for Nettles's claims.

–14–

Regarding the "rationale and purpose" of the sovereign immunity doctrine to guard against unforeseen expenditures that disrupt or hamper government services, GTECH relies on the *Brown & Gay* court's discussion of "the origin and purpose of sovereign immunity." The court explained that sovereign immunity is "inherently connected to the protection of the public fisc" as well as preserving separation-of-powers principles "by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *Id.* at 121. GTECH argues that the Legislature has expressly tied the operation of the Texas lottery to the public fisc by requiring that money in the state lottery account (after payment of prizes and other specific costs) be transferred to the fund for veterans' assistance and the foundation school fund. *See* TEX. GOV'T CODE ANN. § 466.355 (West Supp. 2016).

GTECH also relies on the Legislature's requirement that the TLC "exercise strict control and close supervision over all lottery games conducted in this state to promote and ensure integrity, security, honesty, and fairness in the operation and administration of the lottery." *See id.* § 466.014(a). Nettles's suit challenges the integrity, honesty, and fairness of a decision made by the TLC. Although the TLC will not incur further defense costs in this case, the suit will challenge the TLC's performance of the duties assigned to it by the Legislature. Sovereign immunity shields the government from such an inquiry, however. *See Brown & Gay*, 461 S.W.3d at 122 (citing *Bacon v. Tex. Historical Comm'n*, 411 S.W.3d 161, 172 (Tex. App.—Austin 2013, no pet.) for the proposition that "sovereign immunity generally shields our state government's improvident acts"). Sovereign immunity places the burden of shouldering the costs and consequences of the government's improvident actions on injured individuals. *Id.* Here, however, the "costs and consequences" to Nettles are the cost of her $5 tickets. *See* 16

–15–

TEX. ADMIN. CODE 401.302(i)[6] (claimant's exclusive remedy for disputed ticket is reimbursement for cost of ticket).

We conclude that GTECH met its burden to establish that Nettles's claims are barred by sovereign immunity. We overrule Nettles's issues 1(a) and 1(b).

## CONCLUSION

We affirm the trial court's order granting GTECH Corporation's plea to the jurisdiction.

/Martin Richter/
MARTIN RICHTER
JUSTICE, ASSIGNED

151559F.P05

---

[6] West, Westlaw through 42 TEX. REG. No. 3381, dated June 23, 2017 (Texas Lottery Commission, Administration of State Lottery Act, Instant Game Rules).



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

DAWN NETTLES, Appellant

No. 05-15-01559-CV          V.

GTECH CORPORATION, Appellee

On Appeal from the 160th Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-14-14838.
Opinion delivered by Justice Richter; Justices Lang-Miers and Myers, participating.

In accordance with this Court's opinion of this date, the trial court's Order granting the first amended plea to the jurisdiction of appellee GTECH Corporation is **AFFIRMED**.

It is **ORDERED** that appellee GTECH Corporation recover its costs of this appeal from appellant Dawn Nettles.

Judgment entered this 21st day of July, 2017.