# Supreme Court of Texas

═══════════

No. 22-0056

═══════════

CPS Energy,

*Petitioner*,

v.

Electric Reliability Council of Texas,

*Respondent*

═══════════

On Petition for Review from the
Court of Appeals for the Fourth District of Texas

═══════════

*~and~*

Electric Reliability Council of Texas, Inc.,

*Petitioner*,

v.

Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Fifth District of Texas

JUSTICE BOYD and JUSTICE DEVINE, joined by Justice Lehrmann and Justice Busby, dissenting.

At the heart of sovereign immunity—the doctrine that the Sovereign cannot be sued without its consent—lies a contest between

core values of constitutionalism.[1]  On the one hand, constitutionalism entails a commitment to the rule of law: "the fundamental principle that government is subordinate to the law"[2] and the "very essence of civil liberty" that every individual has the right "to claim the protection of the laws, whenever he receives an injury."[3]  "[I]f the laws furnish no remedy for the violation of a vested legal right," our government will "cease to deserve this high appellation" of "a government of laws, and not of men."[4]

On the other hand, sovereign immunity is essential as "a structural protection for democratic rule," preserving the separation of governmental powers and protecting legislative and executive policy-making—for example, the allocation of the public coffers—from judicial interference and control.[5]  Although "protecting the purse comes

---

[1] *See* Vicki C. Jackson, *Suing the Federal Government: Sovereignty, Immunity, and Judicial Independence*, 35 GEO. WASH. INT'L L. REV. 521, 521 (2003).

[2] *Phillips v. McNeill*, 635 S.W.3d 620, 627 (Tex. 2021) (citing TEX. CONST. art. I, §§ 13, 19).

[3] *Marbury v. Madison*, 5 U.S. 137, 163 (1803); *see also* TEX. CONST. art. I, §§ 13 ("All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law."), 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by due course of the law of the land.").

[4] *Marbury*, 5 U.S. at 163 ("In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.").

[5] *See* Harold J. Krent, *Reconceptualizing Sovereign Immunity*, 45 VAND. L. REV. 1529, 1530 (1992); *see also* TEX. CONST. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of

at the expense of ensuring accountability under the law for the government's breaches,"[6] the political process often serves as a substitute for private lawsuits to deter arbitrary and imprudent governmental action. But immunizing the Sovereign creates considerable tension with the "very essence of civil liberty": it burdens injured individuals with the costs and consequences of the government's improvident actions and "foreclose[s]—absent a legislative waiver—the litigation and judicial remedies that would be available to the injured person had the complained-of acts been committed by private persons."[7]

In the face of this conflict of values, the touchstone for applying sovereign immunity must be the public's trust that the rules of the game are established for their benefit and by the proper institutions.[8] While sovereign immunity was once theoretically justified by the feudal fiction that the "king can do no wrong,"[9] "in our system of government, the

---

magistracy[.]"); *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 409 (Tex. 2020) ("Sovereign immunity restrains judicial interference in the executive and legislative branches so that ultimately the people, not the courts, strike the policy balance between immunizing the government's actions and providing a judicial remedy."). Bolstering the doctrine are also modern political, pragmatic, and pecuniary justifications. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740 (Tex. 2019).

[6] *Rosenberg*, 571 S.W.3d at 741.

[7] *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 122 (Tex. 2015).

[8] *See, e.g.*, Krent, *supra* note 5, at 1530 ("The dominant justification for sovereign immunity must be that we trust Congress, unlike any other entity, to set the rules of the game.").

[9] *Rosenberg*, 571 S.W.3d at 740; *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 431 n.5 (Tex. 2016) (discussing the historical anomaly of relying on the legal fiction that the king could do no wrong).

people"—not a king—"are the sovereign,"[10] and immunity must be for the benefit of *that* sovereign.[11] In applying the doctrine for the people's benefit, history and tradition serve as lodestars for ensuring trust.[12]

Although public trust may be challenging to earn, and even harder to sustain, the judiciary and the Legislature both play a vital role. "To facilitate equipoise in the doctrine's operation," the judiciary first determines its applicability, pruning and shaping its boundaries and contours.[13] And the Legislature, composed of the people's duly elected representatives, maintains the prerogative to waive any existing immunity.[14]

---

[10] *Hall v. McRaven*, 508 S.W.3d 232, 253 (Tex. 2017) (Brown, J., concurring).

[11] *See* TEX. CONST. art. I, § 2 ("All political power is inherent in the people, and all free governments are founded on their authority, and instituted for their benefit.").

[12] The application of immunity to the Sovereign rests on a common-law tradition long predating this State's constitutional founding. *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847) ("[N]o state can be sued in her own courts without her consent[.]"); *see also Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that at the time of *Hosner*, the common-law doctrine was "then more than six centuries old"). And "[l]ike sovereign immunity itself, its common-law limitations and exceptions have deep historical roots" and are "designed to ensure the rule of law." *Phillips v. McNeill*, 635 S.W.3d 620, 627-28 (Tex. 2021) (discussing the ultra vires exception to sovereign immunity and noting that the sovereign-immunity doctrine's limitations and exceptions "trac[e] their lineage to courts' issuance of writs of habeas corpus, mandamus, and injunction against government officials to check acts in excess of lawful authority or compel the performance of a clear legal duty").

[13] *Rosenberg*, 571 S.W.3d at 741; *see also Wasson Ints.*, 489 S.W.3d at 432.

[14] *Rosenberg*, 571 S.W.3d at 741.

5

But the public's trust is undermined when the judiciary extends sovereign immunity, contrary to history and tradition, to what is undeniably not sovereign: purely private entities. Recently, the battle over the doctrine's conflicting values has protruded into a debate on whether private entities should be garbed with the Sovereign's immunity when they act as government contractors or legislatively authorized entities. For private entities acting as government contractors, this Court has contemplated but declined to apply derivative sovereign immunity in a conduct-specific inquiry based on the government's degree of control and the contractor's lack of discretion.[15] For entities the Legislature has specifically authorized to exist or act by statute, the Court has extended sovereign immunity if (1) the authorizing statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government'"[16] and (2) extending immunity "fits within the doctrine's underlying nature and purposes."[17] In both cases, the root justification for possibly protecting private entities with the Sovereign's immunity is that, by statute or contract, they act as arms of the state: the

---

[15] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020); *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 126 (Tex. 2015).

[16] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405 (Tex. 2020) (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

[17] *Id.* at 401 (quoting *Rosenberg*, 571 S.W.3d at 750).

government acted *through* the entity and the actions are *effectively attributed* to the government as "action taken by the government."[18]

Until today, however, this Court had never "extend[ed] sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions."[19] Broadly expanding the doctrine and primarily relying on the statutory oversight authority of the Public Utility Commission of Texas (the PUC), the Court declares that a purely private corporation, Electric Reliability Council of Texas, Inc. (ERCOT), may shield itself under the Sovereign's cloak of immunity as a legislatively authorized entity.[20] Yet unlike any other entity previously granted immunity by this Court, no statute designates ERCOT as a part of the government.[21]

---

[18] *Id.* at 407 (quoting *Brown & Gay*, 461 S.W.3d at 125).

[19] *Id.* at 401.

[20] *Ante* at 29-31, 34-35, 39-40.

[21] This Court has considered extending immunity to legislatively authorized entities four times and granted immunity twice. *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 527, 530 (Tex. 2020) (extending immunity to open-enrollment charter schools); *Redus*, 602 S.W.3d at 405, 413 (denying immunity to a private university for law-enforcement activities); *Rosenberg*, 571 S.W.3d at 750, 752 (denying immunity to an economic-development corporation created and operated by a municipality); *Ben Bolt*, 212 S.W.3d at 325-26 (extending immunity to a self-insurance fund composed of local political subdivisions). In *Amex Properties*, the Legislature expressly designated open-enrollment charter schools as part of the public school system and immune from suit and liability, 602 S.W.3d at 528-29 (quoting TEX. EDUC. CODE §§ 12.105, .1056(a)), and in *Ben Bolt*, "[b]ecause the term 'local government' includes a combination of political subdivisions," the self-insurance fund composed of local political subdivisions was itself a local governmental body, 212 S.W.3d at 324-25 (citing TEX. GOV'T CODE § 791.003(4)(A), (E)). *Ben Bolt* derived the test for legislatively authorized

7

For the reasons the Court explains, we join Parts I, II, and III of the Court's opinion and agree that ERCOT qualifies as a "governmental unit" under the Tort Claims Act (and thus can pursue an interlocutory appeal) and that the PUC has exclusive jurisdiction over the issues underlying the parties' claims against ERCOT. But because Texas law has not vested the private corporation ERCOT with the nature of an arm of the state, we respectfully disagree that sovereign immunity should broadly prohibit courts from exercising jurisdiction over claims against it. Specifically, we first address ERCOT's "nature" as an entity, then consider the "control" the State exerts over ERCOT, and finally evaluate whether extending sovereign immunity to ERCOT would promote the doctrine's nature and purposes. We conclude that none of these factors supports the monumental alteration of the crucial concept of sovereign immunity the Court announces today.

Because the Court holds otherwise, the Legislature could, and in our opinion should, correct the Court's error. To circumscribe the Court's broad expansion of the doctrine, the Legislature could enact a

---

entities from a 1940 decision that did not involve sovereign immunity and instead concerned whether a statutorily created flood-control district constituted a separate and distinct governmental entity from the county. *See Harris Cnty. Flood Control Dist. v. Mann*, 140 S.W.2d 1098, 1101 (Tex. 1940). As noted in later decisions, these flood-control districts are entitled to governmental immunity as constitutionally recognized "governmental agencies." *See* TEX. CONST. art. XVI, § 59(b) (Flood-control "districts shall be governmental agencies and bodies politic and corporate with such powers of government[.]"); *Harris Cnty. Flood Control Dist. v. Mihelich*, 525 S.W.2d 506, 508 (Tex. 1975) ("Districts formed in accordance with Section 59 of Article XVI have been recognized to be governmental agencies and bodies politic and corporate, 'governed by the law applicable to counties,' with the same immunities from tort actions as were enjoyed by the State and its counties[.]").

rule of construction that it does not intend to grant private entities the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it explicitly designates the entity as part of the government. The Legislature could also waive some or all of ERCOT's newfound immunity. In this way, the Legislature could begin restoring the public's trust following this Court's erroneous extension of *sovereign* immunity to a purely private corporation.

## I. ERCOT, Inc.

As mentioned, we have recognized that sovereign immunity may apply to an entity when a Texas statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government.'"[22] This standard requires us to begin by considering ERCOT's nature as an entity, not just the nature of its functions. That ERCOT performs governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[23] We thus begin by considering ERCOT's history leading up to its current status as an entity, which indisputably establishes that ERCOT exists as a purely private entity created and operated by purely private industry participants and, although selected to perform important governmental functions, has never been designated, considered, or characterized as an arm of the state.

---

[22] *Redus*, 602 S.W.3d at 401, 405 (quoting *Rosenberg*, 571 S.W.3d at 750, and *Ben Bolt*, 212 S.W.3d at 325).

[23] *Id.* at 407 (quoting *Rosenberg*, 571 S.W.3d at 750).

9

## A. ERCOT's History

The "electrification of America" occurred rapidly.[24] Within a year after Thomas Edison invented the incandescent electric light bulb in 1878, major cities were using electricity to light streets and selected buildings.[25] Pouncing on the obvious economic opportunities, private firms scrambled to construct generators to serve individual buildings and properties. Seeing the bigger picture, Edison and his General Electric Company opened the first central power plant in 1882.[26] Within two months, the Pearl Street station in New York City boasted 203 customers, and then 513 the following year.[27] By 1889, Edison had built 500 small power plants to serve individual buildings and fifty-eight larger plants to serve several of America's larger cities.[28]

Initially, the scattered power plants and their electricity-distribution systems were "isolated, competitive, and unregulated."[29] The private firms (along with a few cities and rural

---

[24] Robert L. Bradley, Jr., *The Origins of Political Electricity: Market Failure or Political Opportunism?*, 17 ENERGY L.J. 59, 61 (1996).

[25] *Id.* at 59-60.

[26] Gina S. Warren, *Vanishing Power Lines and Emerging Distributed Generation*, 4 WAKE FOREST J.L. & POL'Y 347, 351 (2014); Hon. Richard D. Cudahy & William D. Henderson, *From Insull to Enron: Corporate (Re)regulation After the Rise and Fall of Two Energy Icons*, 26 ENERGY L.J. 35, 39 (2005).

[27] Warren, *supra* note 26, at 350.

[28] *Id.* at 350-51.

[29] Mary Katherine Strahan, *Connecting Currents: Toward the Integration of North American Electricity Markets*, 21 HOUS. J. INT'L L. 291, 292 n.8 (1999).

cooperatives) that constructed and operated the facilities enjoyed "vertically integrated monopolies," each generating, transmitting, and distributing electricity to its own eager consumers.[30] With very few interconnections between their grids, they each served (and charged) their own local customers and, in reality, rarely competed against one another.[31]

That situation began to change in 1892, when Edison's long-time personal assistant, Samuel Insull, left General Electric for the Chicago Edison Company and embarked on a storied career producing huge electric monopolies and, ultimately, the nation's electric grid.[32] By the early 1930s, eight companies controlled two-thirds of the nation's private power producers, and three of them controlled half.[33] Not surprisingly, complaints quickly arose that the nation's electricity system gave "tyrannical power and exclusive opportunity to a favored few."[34]

To promote the on-demand availability of electricity and the reliability of its delivery system at the lowest possible cost, the private,

---

[30] *Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 267 (2016); *see also* Emily Hammonde & David B. Spence, *The Regulatory Contract in the Marketplace*, 69 VAND. L. REV. 141, 149-50 (2016).

[31] *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 5 (2002).

[32] *See* Stephanie Phillips, *Federal Regulation for A "Resilient" Electricity Grid*, 46 ECOLOGY L.Q. 415, 418 (2019); Warren, *supra* note 26, at 353-54; Cudahy & Henderson, *supra* note 26, at 41; Strahan, *supra* note 29, at 292 n.8.

[33] Jeffrey D. Watkiss & Douglas W. Smith, *The Energy Policy Act of 1992—A Watershed for Competition in the Wholesale Power Market*, 10 YALE J. ON REG. 447, 450 (1993).

[34] *Id.* at 451.

investor-owned utilities began interconnecting their individual grids and exchanging power between themselves.[35]  Instead of constructing multiple expensive transmission lines to cover the same areas, they began sharing their lines and charging each other for the transmission service.[36]  As the electricity they each produced separately combined in the transmission grids, areas suffering shortages could purchase extra amounts and pass the costs along to their customers.[37]  Eventually, three main electricity grids developed within the U.S. mainland: "the Eastern Interconnection, the Western Interconnection, and the Texas Interconnection."[38]

The federal government and most states bought in to Insull's idea that the privately owned electric utilities were "natural monopolies."[39] Instead of fighting against the monopolies, the governments legitimized them in exchange for the right to heavily regulate their rates and services.[40]  After the United States Supreme Court held in 1927 that the Constitution's commerce clause prohibits the states from regulating

---

[35] *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 807 (N.D. Tex. 1979).

[36] *New York*, 535 U.S. at 8-9; *see also* Phillips, *supra* note 32, at 422.

[37] *See* Hammonde & Spence, *supra* note 30, at 150-51.

[38] *Id.* at 149-50.

[39] Warren, *supra* note 26, at 353-54.

[40] *See* Phillips, *supra* note 32, at 422; Hammonde & Spence, *supra* note 30, at 150-51.

most *inter*state electricity transactions,[41] Congress passed the Federal Power Act of 1935, authorizing the Federal Power Commission to regulate interstate electricity transmissions and wholesale sales and prohibiting unreasonable rates and undue discrimination.[42] Congress left it to the states, however, to regulate *intra*state transactions and retail sales made directly to consumers.[43]

The uniquely intrastate Texas power grid began its development in 1924 when two privately owned Texas utilities interconnected and later joined with others to create the North Texas Interconnected System.[44] In the 1940s, other Texas utilities joined to create the South Texas Interconnected System to support the nation's World War II efforts.[45] In the 1960s, the North Texas System and the South Texas System joined with other Texas utilities to create the Texas Interconnected System (TIS).[46] The members of TIS adopted their own

---

[41] *See Pub. Util. Comm'n of R.I. v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89-90 (1927); *see also Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 577 U.S. 260, 266 (2016); *New York*, 535 U.S. at 5-6.

[42] *New York*, 535 U.S. at 6-7; *see also Gulf States Util. Co. v. Fed. Power Comm'n*, 411 U.S. 747, 758 (1973); Strahan, *supra* note 29, at 292 n.8.

[43] *Elec. Power Supply Ass'n*, 577 U.S. at 266-67; *see also* Phillips, *supra* note 32, at 423-24.

[44] *W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979).

[45] *Id.*; *see also* Daniel M. Gonzales, *Shockingly Certain: Why Is the Public Utility Commission of Texas Steadfast in Its Resolve to Keep Texas's Energy Market Deregulated Amidst Turmoil?*, 10 TEX. TECH ADMIN. L.J. 497, 500 (2009); Jared M. Fleisher, *ERCOT's Jurisdictional Status: A Legal History and Contemporary Appraisal*, 3 TEX. J. OIL GAS & ENERGY L. 4, 10 (2008).

[46] *W. Tex. Utils.*, 470 F. Supp. at 808.

rules and guidelines to govern their interconnected system and their purchases of power from one another.[47]

Seeking to increase the national grid's reliability, hundreds of the industry's participants joined together in 1968 to create the North American Electric Reliability Corporation (NERC)—a "not-for-profit international regulatory authority"—to operate as the national grid's "electric reliability organization."[48]  Operating as a private, independent, membership-based association, NERC adopted voluntary rules and reliability standards to govern the "bulk power system"—the "entire connection of power plants and transmission lines for the United States, Canada, and Baja California in Mexico that make up the continental system of electricity generation and transmission."[49] NERC's primary purpose was to ensure "that the bulk power system has enough resources to provide electricity to customers at all times, and that electricity will be continuously delivered despite sudden or unexpected shocks to the system."[50]

---

[47] *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001); *see also* Gonzales, *supra* note 45, at 500.

[48] *Del. Dep't of Nat. Res. & Env't Control v. E.P.A.*, 785 F.3d 1, 11 (D.C. Cir. 2015); *see also About NERC*, NORTH AMERICAN ELECTRIC RELIABILITY CORPORATION (2023), https://www.nerc.com/AboutNERC/Pages/default.aspx; Ryan Suit, *Charging Forward with NERC: An International Approach to Solving North America's Grid Problem*, 24 RICH. J.L. & TECH. 3, 15-16 (2018).

[49] Suit, *supra* note 48, at 15.  In 2007, NERC's reliability standards became legal mandates governing participants in the bulk power system.  *Id.* at 16.

[50] *Id.* at 15-16.

Two years later, in 1970, TIS—joined by municipal utilities and rural electric cooperatives operating only within Texas—formed ERCOT to comply with NERC's new voluntary reliability requirements.[51] Established as a "voluntary membership organization" serving as a "regional electric reliability council" under NERC's oversight, ERCOT's primary role was to coordinate electricity transfers among its members and to ensure reliability by maintaining the best possible balance between supply and demand on the Texas grid.[52]

In 1975, the Texas Legislature made its first major effort to regulate the intrastate and retail electric industry by enacting the first version of the Public Utility Regulatory Act (PURA75).[53] Like the 1935 Federal Power Act, PURA75 adopted the regulated-monopoly approach, declaring that electric utilities are "by definition monopolies in the areas they serve" and establishing a "comprehensive and adequate regulatory system" to ensure "just and reasonable" rates, operations, and services as a substitute for "the normal forces of competition."[54] It also created the PUC and empowered it to regulate and supervise the intrastate

---

[51] *See* Fleisher, *supra* note 45, at 10-11.

[52] *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 186 (Tex. 2007); *see also W. Tex. Utils. Co. v. Tex. Elec. Serv. Co.*, 470 F. Supp. 798, 808 (N.D. Tex. 1979); Gonzales, *supra* note 45, at 500; Fleisher, *supra* note 45, at 10-11.

[53] Gonzales, *supra* note 45, at 501-02. Before 1975, some municipalities regulated rates through franchise agreements allowing electric utilities to run distribution lines along city streets. *Id.* at 501.

[54] TEX. UTIL. CODE § 11.002.

electricity industry.[55]  PURA75 did not alter the nature or functions of ERCOT, however, which continued serving as its members' private coordinating organization for their Texas power grid.[56]

In the late 1970s, an international energy crisis, fears about nuclear power, and environmental concerns led Congress to pass the Public Utility Regulatory Policy Act.[57]  This Act sought to promote increased electricity generation by directing the Federal Energy Regulatory Commission (FERC)—a federal agency created to replace the Federal Power Commission—to pass rules requiring private electric utilities to purchase power at a fair price from "qualifying facilities" that generated electricity using renewable, efficient sources.[58]  The addition of these nonutility generators increased both competition in electricity generation and the demand for affordable access to the grids' transmission lines.[59]

By the late 1980s, however, policy views had shifted away from the regulated-monopolies approach in favor of electricity competition.[60] In 1992, Congress passed the Energy Policy Act, which amended the 1935 Federal Power Act to authorize FERC to combat "undue" rate

---

[55] *See* Gonzales, *supra* note 45, at 501-02; Fleisher, *supra* note 45, at 11.

[56] *See* Fleisher, *supra* note 45, at 11.

[57] Watkiss & Smith, *supra* note 33, at 452-54.

[58] *New York v. Fed. Energy Reg. Comm'n*, 535 U.S. 1, 8-9 (2002); *see also Fed. Energy Reg. Comm'n v. Mississippi*, 456 U.S. 742, 751 (1982); Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 452-54.

[59] Hammonde & Spence, *supra* note 30, at 151.

[60] *See* Phillips, *supra* note 32, at 424.

16

discrimination by ordering utilities that owned transmission lines to make their lines available to their competitors.[61] In 1996, FERC exercised that authority by ordering all utilities that owned interstate transmission lines to "functional[ly] unbundl[e]" their operations by separating their electricity-sales business from their transmission services and grant all wholesale buyers and sellers equal access to the transmission lines.[62] FERC's orders also encouraged the industry to establish "independent systems operators" (ISOs) to coordinate the companies' shared use of the transmission lines and the sale of power using those systems.[63] These orders "laid the groundwork for competition in wholesale electricity sales."[64]

Texas soon joined these national deregulation efforts. In 1995, the Legislature amended PURA to deregulate the wholesale electricity market.[65] These amendments required utilities that owned transmission lines to make their lines available to wholesale transmission customers.[66] ERCOT, as the industry-created, private,

---

[61] *New York*, 535 U.S. at 9; *see also* Phillips, *supra* note 32, at 424; Watkiss & Smith, *supra* note 33, at 455-56, 487.

[62] *New York*, 535 U.S. at 10-12; *see also* Phillips, *supra* note 32, at 424-25.

[63] *See* Phillips, *supra* note 32, at 424-25; Hammonde & Spence, *supra* note 30, at 152-53.

[64] Hammonde & Spence, *supra* note 30, at 152.

[65] *Pub. Util. Comm. of Tex. v. City Pub. Serv. Bd. of San Antonio*, 53 S.W.3d 310, 312 (Tex. 2001).

[66] *Id.*

17

nonprofit corporation, continued to serve as the industry's coordinator of its privately owned transmission grid.

In 1999, the Legislature "overhauled" PURA "to create a 'fully competitive electric power industry' in Texas."[67] The thoroughly amended PURA now required all Texas electric utilities operating within the Texas power region to unbundle their services "into three distinct units: (1) a power-generation company; (2) a retail electric provider; and (3) a transmission and distribution utility," no later than January 1, 2002.[68] Under this new structure, the PUC continues to regulate rates charged by transmission and distribution utilities, but instead of regulating retail electricity rates, PURA created "a competitive retail electric market that allows each retail consumer to choose the customer's provider of electricity."[69]

To encourage the creation of generation and retail companies and vigorous competition between them, PURA now also required the PUC to ensure that all participants in the retail market would have equal access to the Texas power region's grid. The retail providers pay the transmission companies for the right to use the grid and then pass those

---

[67] *State v. Pub. Util. Comm'n of Tex.*, 344 S.W.3d 349, 352 (Tex. 2011).

[68] *Id.* PURA allowed the utilities to unbundle "through the creation of separate nonaffiliated companies, the creation of separate affiliated companies owned by a common holding company, or the sale of assets to a third party." *City of Corpus Christi v. Pub. Util. Comm'n of Tex.*, 51 S.W.3d 231, 237 (Tex. 2001).

[69] *Oncor Elec. Delivery Co. v. Pub. Util. Comm'n of Tex.*, 507 S.W.3d 706, 711-12 (Tex. 2017); *see also Pub. Util. Comm'n of Tex.*, 344 S.W.3d at 352; *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elec., LLC*, 324 S.W.3d 95, 97-98 (Tex. 2010); Gonzales, *supra* note 45, at 502-03.

costs along to their customers by incorporating them into their retail rates.[70]

The 1999 statutory amendments did not, however, create ERCOT, which had already existed as the industry-created, privately owned coordinating organization since 1970. Nor did the statute designate ERCOT as the ISO or give ERCOT any particular functions, duties, or powers. Instead, PURA requires industry participants in each "power region" to "establish one or more independent organizations" to serve as the region's coordinating organization and empowers the PUC to "certify" the selected organizations to perform that function.[71] In 2001, the PUC certified ERCOT—which the industry had created in 1970 and formally established as a Texas nonprofit corporation in 1990—as the Texas power grid's ISO.[72] As a certified ISO, ERCOT's duties include managing the wholesale power market and ensuring the industry maintains generation capacity to meet projected demands.[73]

---

[70] *Oncor Elec. Delivery*, 507 S.W.3d at 712.

[71] TEX. UTIL. CODE § 39.151(a), (c). An "independent organization" is an ISO "or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." *Id.* § 39.151(b).

[72] *See* Tex. Pub. Util. Comm'n, *In re ERCOT*, Docket No. 22061, 2000 WL 33959260, at *4 (Apr. 4, 2000) (order); Fleisher, *supra* note 45, at 11; *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

[73] TEX. UTIL. CODE § 39.151(a); *see also Fed. Energy Reg. Comm'n. v. Elec. Power Supply Ass'n*, 577 U.S. 260, 268 (2016) (explaining that ISOs "administer[] a portion of the grid, providing generators with access to transmission lines and ensuring that the network conducts electricity reliably"); Hammonde & Spence, *supra* note 30, at 152-53.

## B. ERCOT's Nature, Purposes, and Powers

With ERCOT's history and current status in mind, we now turn to whether PURA evinces clear legislative intent to vest ERCOT with the nature, purposes, and powers of an arm of the state government. ERCOT essentially concedes that the legislative scheme did not vest it with the nature of an arm of the state before the 1999 PURA amendments, but it insists that ERCOT's subsequent certification as the Texas power region's ISO fundamentally altered ERCOT's nature, purposes, and powers and transformed it into an arm of the state. We disagree.

As we have explained, ERCOT, an industry-created, private entity acting as the industry-designated, PUC-certified ISO for the Texas power region, is statutorily empowered to perform uniquely governmental functions as part of the state's electricity-regulation system: overseeing the region's transmission facilities, coordinating its participants' market transactions, transmissions planning, and network reliability, and—most significantly—exercising rule-making authority to govern the participants' operations.[74] Although ERCOT enjoyed many of these powers and performed many of these functions before 1999, its *functions* took on a different—and necessarily governmental—character when it began taking these actions as the certified ISO as part of the state's management of the competitive electricity market. Its *nature* as an entity, however, did not change.

---

[74] TEX. UTIL. CODE §§ 31.002(9), 39.151.

Because ERCOT exercises statutorily authorized powers to perform governmental functions as part of the state's larger electricity-regulation program, we agree with the Court that it qualifies as a "governmental unit" under the Texas Tort Claims Act.[75] But whether it also qualifies as an "arm of the state" that sovereign immunity protects presents a "separate question[]" and a "separate analytical framework[]."[76] To answer the sovereign-immunity question, we must focus on ERCOT's nature as an entity and not just the nature of its functions. That it performs governmental functions and serves a public purpose "says nothing about the nature of the entity itself."[77]

As an entity, ERCOT began as a membership-based association of electric-industry participants, which later incorporated it as a private, nonprofit corporation. Its members consist mostly of private entities that participate in the deregulated electricity market, including electricity generators, marketers, utilities, retailers, and consumers.[78] The state did not create ERCOT or authorize its creation, and it has remained a private entity even after PURA's 1999 amendments. Its employees are not government employees and do not receive government retirement or other benefits.[79] It is funded not by tax

---

[75] *Ante* at 13-16.

[76] *Univ. of the Incarnate Word v. Redus*, 518 S.W.3d 905, 911 (Tex. 2015).

[77] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

[78] *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

[79] *See Careers*, ERCOT (2023), http://www.ercot.com/careers.

dollars or legislative appropriations but by fees paid by its members and a system administration fee paid by wholesale electricity buyers.[80] It is governed by articles of incorporation and bylaws adopted by its members.[81] It is directly managed not by the PUC or another state agency but by its own board of directors.[82]

But as the Court notes, due to ERCOT's selection and certification as an ISO, PURA indirectly restricts and regulates ERCOT in numerous ways and indirectly grants it various functions and powers that are inherently governmental.[83] As we discuss further below, PURA's indirect grant and regulation of ERCOT's functions and powers are insufficient to alter its nature as a private entity. But our consideration of those functions and powers must begin with the recognition that all PURA's effects on ERCOT are *indirect*. Through all its provisions that empower, impede, or otherwise impact ERCOT, PURA never directly addresses ERCOT. Instead, it empowers, impedes, and impacts whatever ISO or other independent organization the "ERCOT" power

---

[80] TEX. UTIL. CODE § 39.151(e); *see also About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

[81] *See Amended and Restated Certificate of Formation of Electric Reliability Council of Texas, Inc.*, ERCOT (Jan. 31, 2019), https://www.ercot.com/files/docs/2019/02/06/Amended_and_Restated_Certific ate_of_Formation__eff_01.31.2019_.pdf; *Amended and Restated Bylaws of Electric Reliability Council of Texas, Inc.*, ERCOT (Oct. 12, 2021), https://www.ercot.com/files/docs/2022/09/09/01_Current%20ERCOT%20Byla ws.pdf.

[82] *About ERCOT*, ERCOT (2023), http://www.ercot.com/about/profile.

[83] *Ante* at 29-32, 34-35.

region[84] has selected and the PUC has certified. PURA does not address, and therefore certainly does not alter, the private, nongovernmental nature of whatever entity is selected and certified as an ISO.

As an independent, privately owned, nonprofit corporation, ERCOT is subject to PURA's restrictions and requirements only because it applied for and was granted the PUC's certification as the power region's ISO. The restrictions apply to ERCOT not because of its nature as an entity but because of its position as the PUC-certified ISO. The Legislature could have assigned an existing governmental entity or created a new one to serve as the ISO, or it could have amended PURA to directly address and regulate ERCOT itself in ways that could indicate an intent to transform it into a governmental entity that is, by nature, an arm of the state. But instead, the Legislature has authorized the PUC to select a private entity to fulfill the ISO's functions.[85] That choice was consistent with the 1999 PURA amendments, which deregulated the retail electricity market so that it would be subject to "normal forces of competition" and "customer choices," rather than state

---

[84] *See* TEX. UTIL. CODE § 39.151. Somewhat confusingly, PURA designates the Texas power region for which ERCOT serves as the ISO as the "Electric Reliability Council of Texas" or "ERCOT." *Id.* § 31.002(5) ("'Electric Reliability Council of Texas' or 'ERCOT' means the area in Texas served by electric utilities, municipally owned utilities, and electric cooperatives that is not synchronously interconnected with electric utilities outside the state."); *Texas v. U.S. Env't Prot. Agency*, 829 F.3d 405, 431 (5th Cir. 2016) (noting that the Texas grid "shares the name of its governing board, the Electric Reliability Council of Texas (ERCOT)").

[85] TEX. UTIL. CODE § 39.151(a), (c).

23

regulation.[86]  Instead of governmentalizing the ISO, PURA authorizes the PUC to select a *private entity* to fill that role.

The PUC, in turn, chose to certify ERCOT as the ISO, but it has not understood the ISO, or ERCOT in particular, to be a governmental entity or otherwise protected by sovereign immunity.  The PUC has adopted rules that purport to grant ERCOT protection against liability for certain specified actions.[87]  Because sovereign immunity protects the government against both suit and liability, these rules would be unnecessary if ERCOT enjoys sovereign immunity.  To the contrary, the PUC has expressly recognized that ERCOT may be subject to "civil relief that may be available under federal or state law."[88]

PURA never identifies the ISO as a governmental entity or expresses any intent that it be protected by sovereign immunity.  It subjects the ISO to substantial regulation, but "heavily regulating an entity does not equate to conferring governmental-entity status."[89]  Nor does it change the entity's "nature."  In light of ERCOT's original and persistent nature as an industry-created, privately owned, nonprofit corporation, and in the absence of anything in PURA that purports to

---

[86] *See id.* § 39.001(a).

[87] *See* 16 TEX. ADMIN. CODE §§ 25.43(o)(2) (protecting ERCOT from liability for transitioning or attempting to transition a customer from a retail electric provider to a provider of last resort), .200(d) (protecting ERCOT from liability for negligently causing service interruptions while attempting to maintain system stability and safety), .361(c) (protecting ERCOT from liability for events beyond its control that could not reasonably be anticipated).

[88] *Id.* § 25.362(j)(6).

[89] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

alter that nature, we conclude that PURA did not vest ERCOT with the nature, purposes, and powers of an arm of the state.

## II. State Control

Even if we were to ignore the fact that PURA never attempts to directly empower, impede, or impact ERCOT and instead assumed that all PURA's provisions addressing a PUC-certified ISO directly address ERCOT itself, we would still conclude that those provisions do not transform ERCOT's nature into that of an arm of the state. By indirectly granting the PUC "complete authority to oversee and investigate" ERCOT's operations, finances, and budget "as necessary" to ensure accountability and adequate performance,[90] PURA provides the PUC with broad oversight authority over ERCOT (as the ISO). But for the PUC to act through ERCOT such that its actions are effectively attributed to the government,[91] the PUC first must exercise its oversight authority to control ERCOT's actions, and, under PURA, the exercise of that authority must be "necessary."

As described below, our cases instruct that if a private entity has not been designated as part of the government and the government does not control the entity's conduct, the complained-of actions are considered the entity's independent and discretionary actions and it did not act as an arm of the state. Fundamentally, authority to oversee is not actual control. If the Court's inquiry rests on control, the proper question should be whether the PUC *exercised* its oversight authority to

---

[90] *See* TEX. UTIL. CODE § 39.151(d).

[91] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 407 (Tex. 2020) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

25

"sufficient[ly] control" ERCOT's complained-of actions such that they were "effectively attributable" to the government and were not ERCOT's discretionary actions.[92]  As the PUC has exclusive jurisdiction over the issues underlying the parties' causes of action, we would, to "ensure[] an orderly procedure," at least wait for the PUC to "apply its expertise," "develop a complete factual record,"[93] and make relevant factual findings about any exercise of its oversight authority before determining whether or what type of immunity should be extended to ERCOT based on any government control.[94]

The Court instead concludes that PURA evinces clear legislative intent to vest ERCOT with the nature of an arm of the state because "ERCOT operates under the direct control and oversight of the PUC."[95] The Court relies largely on PURA provisions indirectly (1) granting the PUC "complete authority" over ERCOT's operations, finances, and budget, (2) making ERCOT "directly responsible and accountable to" the PUC, and (3) allowing the State to exercise some control or influence over ERCOT through various means, including by appointing members

---

[92] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

[93] *See Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016).

[94] *See Redus*, 602 S.W.3d at 408 n.58 (surveying other state decisions and noting that (1) "[s]ome states hold that sovereign immunity does not extend to a private entity regardless of government control," (2) "[o]ther states hold that, if derivative immunity exists, it provides 'immunity' from liability if the defendant was not otherwise culpable," and (3) "to the extent it is recognized as 'immunity,' it is most often considered 'immunity from liability,' not immunity 'from suit'").

[95] *Ante* at 29.

26

to the ERCOT board selection committee.[96]  The Court, however, overreads both our case law and PURA and glosses over whether the complained-of conduct was not ERCOT's "'independent action,' but rather 'action taken by the government.'"[97]

## A. Relevant Case Law

The common-law doctrine of sovereign immunity rests on a historical tradition that precedes the constitutional founding of this State and even of the Union.[98]  But there is no history or tradition of extending common-law sovereign immunity to private corporations.  As noted recently by Judge Oldham on the United States Court of Appeals for the Fifth Circuit, "[i]t's evident that at common law, both in England and the early American Republic, incorporated entities were not entitled to sovereign immunity," "regardless of whether they exercised governmental functions."[99]  After extensive historical analysis,[100] Judge Oldham distilled the following rule: "If an entity has a separate legal

---

[96] *See id.* at 29-31 (citing TEX. UTIL. CODE §§ 39.151(d), (d-1), (d-4)(3), (e), (g), (g-1), .1513).

[97] *Redus*, 602 S.W.3d at 407 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

[98] *See Alden v. Maine*, 527 U.S. 706, 715-16 (1999) ("[T]he doctrine that a sovereign could not be sued without its consent was universal in the States when the Constitution was drafted and ratified."); *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (noting that in 1847, when this Court first recognized the doctrine in its second term, the rule was "then more than six centuries old").

[99] *Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 191 (5th Cir. 2023) (Oldham, J., concurring).

[100] *Id.* at 191-98 (reviewing English common-law tradition, debates between Federalists and Anti-Federalists, and early American court cases).

status from the State (*e.g.*, as a corporation, LLC, or § 501(c)(3) nonprofit organization) . . . the entity is not 'the State' and hence is not entitled to sovereign immunity."[101]  But Judge Oldham noted that this rule would concern "what enjoys the State's sovereign immunity in *federal* court," and "States are obviously free to cloak non-State entities with all manner of governmental immunities in *state* court," citing as an example Section 12.1056(a) of the Texas Education Code.[102]

Texas's common-law history has followed a similar trajectory of considering private entities with a separate legal status from the State as not being an arm of the government.  Indeed, we have departed from this rule as to private entities only once before today—in 2020.[103]  But there, we relied on the same statute Judge Oldham referenced in his opinion, which directed that certain private entities have immunity to the same extent as public entities, and on a statutory designation that those entities were part of the state government.[104]

In that case, *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, this Court extended governmental immunity[105] for the first time

---

[101] *Id.* at 198.

[102] *Id.* at 199 n.6.

[103] *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 524 (Tex. 2020).

[104] *See id.* at 528-31 (citing TEX. EDUC. CODE §§ 12.105, .1056(a)).

[105] *Cf. Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 746 (Tex. 2019) (although not sovereign entities, political subdivisions share the State's immunity under the governmental-immunity doctrine when performing governmental functions as the State's agent).

to a private entity—open-enrollment charter schools.[106] Although these schools are typically "private, nonprofit organization[s]," the Legislature expressly designated open-enrollment charter schools as "part of the public school system of this state" and directed that "[i]n matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district."[107] Because these charter schools "expressly operate as part of the State's public education system," are "accountable to State government through oversight of their charters and the receipt of substantial public funding," and "exercise the same powers and perform government tasks in the same manner as traditional public schools," the Court concluded that they "act as an arm of the State government."[108]

On the same day as *Amex Properties*, the Court issued *University of the Incarnate Word v. Redus*.[109] There, the Court considered whether a private university, neither created nor chartered by the State, was entitled to sovereign immunity for actions taken by its legislatively authorized campus police department.[110] Specifically contrasting the Legislature's "limited authorization to private universities to commission peace officers" with its express "incorporation of

---

[106] *Amex Props.*, 602 S.W.3d at 529-30.

[107] *Id.* at 528-29 (quoting TEX. EDUC. CODE §§ 12.105, .1056(a)).

[108] *Id.* at 529-30; *see also Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 406 n.51 (Tex. 2020).

[109] 602 S.W.3d at 398.

[110] *Id.* at 404.

open-enrollment charter schools into the State's public-education system," the Court noted that "no similar declaration exists" designating a private university as part of the government or directing that private universities have immunity from suit.[111] The Legislature did not "categorically transform[]" the private university's status to "government-entity status."[112]

In conducting its analysis, the *Redus* Court found "instructive" the "control" requirement contemplated in the government-contractor case *Brown & Gay Engineering, Inc. v. Olivares*.[113] The Court explained that "the extent to which the government *exercises* control . . . is relevant" and "sovereign immunity *potentially* extends to the University if the complained-of conduct was not the University's 'independent action,' but rather 'action taken by the government.'"[114] Because the university's administration and governing board "are alone responsible for its police department's day-to-day operations and decision making" and not accountable to the taxpayers or public officials, the necessary control for the private university to be an arm of the state was absent.[115]

[111] *Id.* at 411-13 & n.79.

[112] *Id.* at 412.

[113] *Id.* at 407 (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)).

[114] *Id.* (emphases added) (quoting *Brown & Gay*, 461 S.W.3d at 125). In *Brown & Gay*, the Court considered cases where "the complained-of conduct for which the contractor was immune was effectively attributed to the government. That is, the alleged cause of the injury was not the independent action of the contractor, but the action taken by the government *through* the contractor." 461 S.W.3d at 125.

[115] *Redus*, 602 S.W.3d at 407-08.

Although the Court contemplated the entity's accountability to the government as a component of control, it did not hold that accountability would have been sufficient on its own to conclude that a private entity had the nature of an arm of the state; it held only that the absence of accountability demanded the conclusion that the government did not sufficiently control the entity for it to be considered an arm of the state.[116]

A month after *Redus*, the Court expounded on the *Brown & Gay* "control" requirement in the government-contractor case *Nettles v. GTECH Corp.*[117] At issue in *Nettles* was whether a government contractor for the Texas Lottery Commission had derivative immunity.[118] Because the Court concluded the control-based standard was not satisfied, it expressly declined to recognize derivative sovereign immunity for contractors, just as it had declined to recognize such immunity in *Brown & Gay*.[119] But the Court clarified the standard as, put simply, asking "(1) did the government tell the contractor what to do and how to do it (as opposed to the contractor having 'some discretion in performing the contract'); and, if so, (2) did the contractor do as it was told?"[120]

---

[116] *Id.*

[117] 606 S.W.3d 726, 731-36 (Tex. 2020).

[118] *Id.* at 728.

[119] *Id.* at 733.

[120] *Id.* at 732 (footnote omitted) (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 130 n.6 (Hecht, C.J., concurring)); *see also Brown & Gay*, 461 S.W.3d at 125-26 ("In this case, the [plaintiffs] do not complain of harm caused by [the government contractor]'s implementing the

As the Court explained in *Nettles*, applying this control-based standard requires looking "first to the 'complained-of conduct' in the pleadings" and then to any evidence "'necessary to resolve the jurisdictional issues raised.'"[121] Ultimately, this control-based standard asks whether the government "had sufficient control over" the entity's actions such that they were "effectively attributable" to the government and were not the entity's "independent actions" or whether the entity "had some discretion."[122] Under the governing statute and the contract with the Texas Lottery Commission's contractor, "[f]inal decisions regarding the direction or control of the Lottery are always the prerogative of the [Commission] in its sole discretion,"[123] and the Commission has "broad authority and shall exercise strict control and close supervision over all lottery games."[124] But the Court held that "close supervision and final approval of work over which a contractor has discretion" do not make actions effectively attributable to the government.[125]

From these cases, we can derive a few controlling principles regarding the nature of an arm of the state. Private, incorporated

---

[government]'s specifications or following any specific government directions or orders.").

[121] 606 S.W.3d at 733-34 (quoting *Brown & Gay*, 461 S.W.3d at 125, and *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000)).

[122] *Id.* at 733.

[123] *Id.* at 735-36.

[124] TEX. GOV'T CODE § 466.014(a); *Nettles*, 606 S.W.3d at 736.

[125] *Nettles*, 606 S.W.3d at 736.

entities have a distinct legal status separate from the State and, as a general proposition, are not an arm of the state. But when the Legislature expressly designates a private entity as part of the government and makes the entity accountable through government oversight—thereby "categorically transforming" the entity's status to "government-entity status"[126]—the government need not exercise actual control over the entity's actions for the entity to have the nature of an arm of the state.[127] If there is no express designation, however, sovereign immunity, at most, "potentially extends" to the private entity only if it is accountable to the government *and* the government "exercises control over the activities" such that the "complained-of conduct" is not "'independent action,' but rather 'action taken by the government.'"[128] For a private entity's action to be "effectively attributable" to the government based on control, close supervision and final approval is insufficient when the entity has discretion to perform the work.[129]

---

[126] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 412 (Tex. 2020).

[127] *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-30 (Tex. 2020).

[128] *Redus*, 602 S.W.3d at 407-08 (quoting *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court notes that "we have never held that a complete lack of discretion is required for immunity in an arm of the state analysis for a legislatively authorized entity." *Ante* at 33. But we also have never held that an entity not expressly designated as part of the government—like ERCOT—is entitled to sovereign immunity as a legislatively authorized entity.

[129] *Nettles*, 606 S.W.3d at 731-37.

## B. Oversight or Control

The Legislature has not designated ERCOT as part of the government but has indirectly directed that ERCOT (as a PUC-certified ISO) "is directly responsible and accountable to" the PUC.[130] Applying the above-mentioned case-law principles, our inquiry concerns the extent to which the government exercised control such that ERCOT's actions could be effectively attributed to the government.

The Court asserts that "ERCOT operates under the direct control and oversight of the PUC" and "the state has complete authority over everything ERCOT does to perform its statutory functions."[131] But this reads PURA too broadly. PURA grants the PUC "complete authority to *oversee and investigate* the organization's finances, budget, and operations *as necessary* to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties."[132] Only if ERCOT, as the PUC-certified ISO, "does not adequately perform the organization's functions or duties or does not comply with this section" is the PUC authorized to "take appropriate action . . . including decertifying the organization or assessing an administrative penalty against the organization."[133] Insofar as ERCOT, through its discretionary and independent actions,

---

[130] TEX. UTIL. CODE § 39.151(d).

[131] *Ante* at 29-30.

[132] TEX. UTIL. CODE § 39.151(d) (emphases added).

[133] *Id.*; *see also* 16 TEX. ADMIN. CODE § 25.364(d) (requiring the PUC to find that the ISO "has committed significant violations of PURA or [PUC] rules or failed to efficiently and effectively carry out the duties of an independent organization" before decertification).

"adequately perform[s]" its ISO functions and duties, the PUC's statutory authority to control ERCOT's operations appears to be limited.

The Court notes that ERCOT's bylaws and protocols require input from and approval by the PUC and that the PUC can "approve, disapprove, or modify any item" in ERCOT's proposed annual budget.[134] But bylaws, protocols, and budgets set broad constraints within which ERCOT can exercise its discretion, and this authority is akin to the "close supervision and final approval" that this Court has found insufficient to establish the necessary control.[135]

The Court points out that state officials, by appointing members of a board selection committee, have the power to indirectly appoint members of the board of directors for the PUC-certified ISO for the ERCOT power region.[136] But the power to appoint is the power to influence, not control.[137] Ultimately, no state official has been put in charge of ERCOT, and a private board still runs the nonprofit

---

[134] *Ante* at 30-31 (quoting Tex. Util. Code § 39.151(d-1), (g-1)).

[135] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020) ("But close supervision and final approval of work over which a contractor has discretion are not the same as the government specifying the manner in which a task is to be performed.").

[136] *Ante* at 30 (citing Tex. Util. Code §§ 39.151(g), (g-1), .1513).

[137] The provisions providing the appointment power do not give the government any formal control over the board members' decisions once appointed. *See* Tex. Util. Code §§ 39.151(g)–(g-6), .1513; *cf. In re Abbott*, 645 S.W.3d 276, 280 n.1 (Tex. 2022) ("The Governor frequently appoints these officers, but the state agencies' enabling statutes rarely give the Governor formal control over the officers' decisions once appointed.").

35

corporation.[138]  Two of the eleven-member board are state officials: the PUC Chairperson and the Public Counsel of the Office of the Public Utility Counsel.[139]  Only the latter is a voting director—one of nine voting directors—and by statute, represents not the public at large but "residential and small commercial consumer interests."[140]

ERCOT is subject to some requirements typically reserved for state entities: it is "subject to review (but not abolishment) under the Sunset Act" and "required to open its board meetings to the public."[141] But ERCOT is also "not subject to state contracting standards, the Open Meetings Act, Administrative Procedure Act, or other requirements traditional state agencies must meet."[142]  And "heavily regulating an entity does not equate to conferring governmental-entity status."[143]

Although the "PUC's oversight of ERCOT's finances, budget, and operations is essential," this oversight authority is necessary because ERCOT, as a private corporation, "is not subject to other traditional oversight mechanisms, such as the legislative appropriations

---

[138] *See Governance*, ERCOT (2023), https://www.ercot.com/about/governance.

[139] *See* TEX. UTIL. CODE § 39.151(g-1).

[140] *See id.* § 39.151(g-1)(2).

[141] *Ante* at 32 (citing TEX. UTIL. CODE §§ 39.151(n), .1511).

[142] SUNSET ADVISORY COMMISSION, STAFF REPORT WITH COMMISSION DECISIONS: PUBLIC UTILITY COMMISSION OF TEXAS, ELECTRIC RELIABILITY COUNCIL OF TEXAS, OFFICE OF PUBLIC UTILITY COUNSEL 3 (January 2023), https://www.ercot.com/files/docs/2023/01/20/PUC-ERCOT-OPUC-Staff-Report -with-Commission-Decisions_1-19-23.pdf.

[143] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019).

process."[144] And without a determination that ERCOT is not adequately performing its functions and duties, the PUC's oversight authority is more like "close supervision" of ERCOT's discretionary and independent actions.[145]

If the PUC found that ERCOT did not adequately perform its duties as the PUC-certified ISO, the PUC would be statutorily authorized to "take appropriate action" and exercise its "complete authority."[146] But whether the PUC *exercised* its oversight authority to "sufficient[ly] control" ERCOT's complained-of actions such that they "were effectively attributable to" the PUC and were not "independent actions"[147] would depend on a factual and complaint-specific inquiry. Currently, the PUC mainly uses rulemaking proceedings and contested cases to guide and direct ERCOT's actions.[148] Although PURA "does not clearly identify how [the] PUC can give ERCOT direction outside of a contested case or rulemaking proceeding," the PUC "has broadly interpreted its statutory authority" to allow "informal mechanisms to guide ERCOT's actions, including verbal directives, memos, and orders."[149] But even if the PUC desired to exercise its oversight

---

[144] SUNSET ADVISORY COMMISSION, *supra* note 142, at 80.

[145] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 736 (Tex. 2020).

[146] *See* TEX. UTIL. CODE § 39.151(d).

[147] *See Nettles*, 606 S.W.3d at 733.

[148] SUNSET ADVISORY COMMISSION, *supra* note 142, at 41.

[149] *Id.* ("While these informal methods may help the commission move quickly, they do not always adhere to best practices for openness, inclusiveness, and transparency."). The Sunset Commission has also recently found that the "PUC needs more formalized structures and processes when

authority over ERCOT, it may lack the necessary resources and capabilities to do so.[150]  In short, without an additional factual showing

giving ERCOT direction that affects the electric industry and millions of Texans," *id.* at A1, and recommended that the Legislature "[a]uthorize [the] PUC to issue directives to ERCOT through written memos and orders, in addition to rulemaking and contested cases, and authorize stakeholders to formally provide input on theses directives," *id.* at A2.  For emergency situations, the Sunset Commission recommended to the Legislature:

> Clarify that [the] PUC can only direct ERCOT outside of these methods in an emergency or other urgent situation that poses an imminent threat to public health, safety, or grid reliability. If [the] PUC's direction to ERCOT is still necessary 72 hours after the emergency or urgent situation, [the] PUC must use the more formal process established under the recommendation to provide documentation of its direction to ERCOT.

*Id.*  Neither the PUC nor ERCOT argues that the PUC used formal or informal mechanisms to control ERCOT's complained-of actions.

[150] For example, the Sunset Commission's Report explains:

> [The] PUC currently lacks the expertise and staff resources to independently analyze an abundance of electric data and information to make fully informed regulatory decisions, including evaluating their impacts on market participants and the general public. . . .

> While [the] PUC has complete authority to access ERCOT's data, which includes vast amounts of operational and financial data about electricity generation, consumption, and pricing, it lacks the technological capability to do so independently of ERCOT. . . . Further, any analysis provided by ERCOT may still carry inherent bias due to its focus on grid operations, which prioritizes reliability over considering the cost of such operations.  Even if ERCOT were able to provide regulatory impact analysis, [the] PUC staff's current lack of analytical capabilities forces the agency to rely on ERCOT's analysis without independent verification.

*Id.* at 37-38; *see also id.* at A1 ("The Sunset Commission found [the] PUC was ill-prepared for the task [of being a more active overseer of ERCOT] and is

of actual control, the PUC's oversight authority does not "evince[] 'clear legislative intent'" to vest the private corporation ERCOT with the nature of an arm of the state.[151]

The Court claims ERCOT "is much like a state agency" based on the "level of control and authority the state exercises over it, and its accountability to the state."[152] But a state agency necessarily acts in the government's name as an express part of the government and does not perform proprietary functions.[153] There is two-way accountability: (1) state agencies are accountable to the State *and* (2) the government is directly accountable to the people for the state agency's actions.

The same is not true for ERCOT. ERCOT is a private corporation that has not been expressly designated as part of the government. The PUC may be accountable to the people for failing to exercise its oversight authority, or state officials may be accountable for appointing the wrong people to the PUC or even to the ERCOT board selection committee. But this is not direct accountability for ERCOT's actions. The government can politically disclaim responsibility for the private corporation's

---

woefully under-resourced given its critical responsibilities and the work that still lies ahead.").

[151] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 405, 407 (Tex. 2020) (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019)).

[152] *Ante* at 29.

[153] *See Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 433 (Tex. 2016). Of course, state officials could act ultra vires, which are not considered acts of the state. *See Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017) ("The basic justification for this *ultra vires* exception to sovereign immunity is that *ultra vires* acts—or those acts without authority—should not be considered acts of the state at all.").

actions when ERCOT acts at its discretion and not under the PUC's control. In other words, ERCOT's actions are not "effectively attributable" to the government unless the PUC exercised sufficient control over ERCOT's actions; otherwise, ERCOT, as a private entity, "had some discretion" to conduct "independent actions."[154]

Indeed, legislatively authorizing private entities to perform public purposes without designating them as part of the government may provide the government with the political benefit of not having express accountability for those entities' actions.[155] The government could avoid blame or responsibility for any negative repercussions by disavowing the private entity's improvident actions, which could encourage a hands-off approach with minimal oversight before any public outcry.[156] And if a private entity were granted broad sovereign immunity regardless of the government's actual control, the entity would have little incentive to seek direction or guidance from the overseeing governmental agency. But if immunity instead depended on the government's actual control, a private entity would be motivated to collaborate with and seek direction from the overseeing governmental agency to cloak its actions with the Sovereign's immunity.

---

[154] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 733 (Tex. 2020).

[155] *See Rosenberg*, 571 S.W.3d at 750 ("[M]erely engaging in an act that serves a public purpose says nothing about the nature of the entity itself[.]").

[156] *See, e.g.*, SUNSET ADVISORY COMMISSION, *supra* note 142, at 1 (noting that after blackouts in 2011 "signaled potential underlying problems," the PUC's "business as usual continued," and with ERCOT "generally managing the grid, [the] PUC never had cause to take a step back and consider how things were working, how it might improve operations, or what funding and staff may be needed to do so").

Since the 2020 *Amex Properties* decision—the only previous decision from this Court to extend sovereign or governmental immunity to a private entity—the Legislature has known that this Court relies on statutory provisions expressly designating an entity as part of the government and directing that immunity applies to an entity.[157] Yet, the Legislature has not designated ERCOT as part of the government or directed that it should have immunity, notwithstanding the Lieutenant Governor's announcement of ERCOT reform as a top priority for the 2021 Legislative Session[158] and the Legislature's significant enactments reforming ERCOT (as the PUC-certified ISO).[159] If the Legislature had "categorically transform[ed]" ERCOT by designating the private corporation as part of the government—as it did for open-enrollment charter schools—this case might be different.[160] But it did not.

---

[157] *See El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521, 528-29 (Tex. 2020); *see also Redus*, 602 S.W.3d at 412 (noting that "[t]he statutory text demonstrates the legislature's awareness of the ramifications of government-entity status" and "[r]ather than categorically transforming a private university's status, the statute links immunity to the peace officers who perform law enforcement functions").

[158] *Lt. Gov. Dan Patrick Announces Top 31 Priorities for the 2021 Session*, OFF. OF THE LIEUTENANT GOVERNOR (Feb. 23, 2021), https://www.ltgov.texas.gov/2021/02/23/lt-gov-dan-patrick-announces-top-31-priorities-for-the-2021-session/.

[159] *See* Act of May 30, 2021, 87th Leg., R.S., ch. 908, 2021 Tex. Gen. Laws 2218, 2218-27; Act of May 28, 2021, 87th Leg., R.S., ch. 950, 2021 Tex. Gen. Laws 2465, 2465-72.

[160] *See Redus*, 602 S.W.3d at 412. Of course, the mere designation of a private entity as part of the government is not sufficient to establish the entity as an arm of the state entitled to sovereign immunity. *See id.* at 405.

The parties do not argue, and the record does not establish, that the PUC exercised sufficient control such that the complained-of ERCOT actions are "effectively attribute[able] to" the government.[161] As this Court has done in the government-contractor context,[162] we would not decide at this stage whether, under the standard for legislatively authorized entities, the government's exercise of some degree of actual control would extend the Sovereign's immunity to a private entity not expressly designated as part of the government.[163] Because the PUC has exclusive jurisdiction over the underlying issues in these cases, the PUC perhaps will develop the factual record and make fact findings about any control it exercised over ERCOT's complained-of conduct.[164]

---

[161] *See Nettles v. GTECH Corp.*, 606 S.W.3d 726, 731 (Tex. 2020) (citing *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 125 (Tex. 2015)). The Court asserts that "the PUC had significant control and authority over the very conduct at issue in these cases." *Ante* at 33-34. But "ha[ving] significant control and authority" is not the same as exercising control over the complained-of conduct. CPS Energy expressly distinguishes between ERCOT's and the PUC's actions, stating that it "is not contesting the entire five-day period [of high wholesale electricity prices], or the PUC Orders, but only ERCOT's failure to follow those orders during the storm's last 33 hours," and that "CPS Energy's complaints do not concern these PUC Orders. The problem lies in ERCOT's decision not to follow them." And although Panda may have agreed that "the PUC *could have* controlled the CDR data output had it wanted to," *id.* at 34 (emphasis added), the issue is whether the PUC actually controlled ERCOT.

[162] *See Brown & Gay*, 461 S.W.3d at 126 ("We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative.").

[163] *Redus*, 602 S.W.3d at 407 (noting that sovereign immunity "potentially extends" if the complained-of conduct was effectively "action taken by the government").

[164] The Court implies that we should not consider specific conduct because "[s]overeign immunity is entity-based." *Ante* at 33 (quoting *Redus*, 602

Should the parties pursue judicial relief after exhausting administrative remedies, this Court could consider any sovereign-immunity arguments based on control with the added benefit of a developed factual record. This approach would respect the Legislature's decisions to (1) not designate ERCOT as part of the government, (2) grant the PUC "complete authority" as specified in PURA over ERCOT's operations, and (3) establish a pervasive regulatory regime that provides the PUC with exclusive jurisdiction over issues that fall under the PUC's "complete authority."[165]

## III. Sovereign Immunity's Nature and Purposes

As mentioned, we have concluded that sovereign immunity might reach a legislatively authorized private entity if (1) the entity's authorizing statute "evinces 'clear legislative intent' to vest the entity with the 'nature, purposes, and powers' of an 'arm of the State government'"[166] *and* (2) extending immunity "fits within the doctrine's underlying nature and purposes."[167] Even if we concluded that PURA

---

S.W.3d at 407). But the Court then holds that "ERCOT would not be immune outside that role" as the ISO, distinguishing between ERCOT's *conduct* as an ISO and its *conduct* outside that role for immunity purposes. *Id.* at 40. To the extent sovereign immunity possibly applies when the private entity is not expressly designated as part of the government, it should depend on whether the government has oversight authority *and* actually exercised that authority and control over the conduct at issue.

[165] *See* TEX. UTIL. CODE § 39.151(d).

[166] *Redus*, 602 S.W.3d at 405 (quoting *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 750 (Tex. 2019), and *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 325 (Tex. 2006)).

[167] *Id.* at 401 (citing *Rosenberg*, 571 S.W.3d at 750).

has somehow altered ERCOT's nature as an entity, we would nevertheless conclude that extending sovereign immunity to ERCOT would not promote the doctrine's "political, pecuniary, and pragmatic" purposes.[168]

Politically, we continue to recognize sovereign immunity because it "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars."[169] By preserving the common-law doctrine of sovereign immunity, the courts maintain an "equilibrium among the branches of government" by allowing the Legislature to decide, as a policy matter, when to "allow tax resources to be shifted 'away from their intended purposes toward defending lawsuits and paying judgments.'"[170] In short, sovereign immunity prevents the courts from "intruding into" the policy-making branch's role of managing and appropriating the public's funds.[171]

By requiring a legislative decision to make tax dollars available to pay the costs of litigation and judgments, sovereign immunity serves the pecuniary purpose of ensuring "that the taxes the public pays are used 'for their intended purposes.'"[172] It "protects the public treasury by

---

[168] *Rosenberg*, 571 S.W.3d at 740.

[169] *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

[170] *Rosenberg*, 571 S.W.3d at 740-41 (quoting *Brown & Gay*, 461 S.W.3d at 121).

[171] *See Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019).

[172] *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019) (quoting *Reata Constr. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006)); *see also*

shielding the public 'from the costs and consequences of improvident actions of their governments,'"[173] particularly the "unforeseen" costs of "defending lawsuits and paying judgments."[174]

And pragmatically, sovereign immunity "serves to prevent governmental paralysis"[175] by protecting "the State and its political subdivisions from endless litigation," which "hamper[s] government functions."[176]  It safeguards "the public as a whole" by protecting its governmental agencies from both the "distraction" of lawsuits and the risks that litigants could control government action through the courts instead of through the political process.[177]

Extending sovereign immunity to ERCOT would, at best, only minimally promote these purposes.  ERCOT does not receive tax dollars or appropriated funds, so permitting judgments against it would not require the unforeseen diversion of tax dollars from their legislatively appropriated purpose or interfere with or usurp the Legislature's policy decisions on how to allocate tax revenues.[178]  The Court concludes that

---

*Chambers–Liberty Cntys. Navigation Dist. v. State*, 575 S.W.3d 339, 347 (Tex. 2019).

[173] *Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 404 (Tex. 2020) (quoting *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006)).

[174] *Brown & Gay*, 461 S.W.3d at 123.

[175] *Hughes*, 573 S.W.3d at 218.

[176] *Ben Bolt-Palito Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivs. Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 326 (Tex. 2006).

[177] *Hays St. Bridge Restoration Grp. v. City of San Antonio*, 570 S.W.3d 697, 704 (Tex. 2019) (quoting *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 839 (Tex. 2018), and *Reata Constr.*, 197 S.W.3d at 382).

[178] *See Brown & Gay*, 461 S.W.3d at 121.

although ERCOT's funds are not taxes, they are effectively public funds because PURA empowers the PUC to authorize and set the amounts of the regulatory fees ERCOT charges to buyers and sellers of wholesale electricity.[179] But even if regulatory fees charged *by state agencies* constitute public funds that are equivalent to tax dollars, ERCOT's funds are paid by private entities to a private entity and are never held by a governmental entity. Like any other private entity, ERCOT can procure insurance to protect its funds against liabilities.[180] Sovereign immunity exists to protect against "the payment of taxpayer dollars subject to legislative discretion," not the payment of private funds that may be authorized or regulated by statute.[181]

ERCOT urges that judgments in the cases against them would be financially devastating to ERCOT and could undermine PURA's regulatory scheme.[182] But despite this "too big to fail" argument,

---

[179] *Ante* at 31, 37; *see also* TEX. UTIL. CODE § 39.151(e); *TracFone Wireless, Inc. v. Comm'n on State Emergency Commc'ns*, 397 S.W.3d 173, 175 n.3 (Tex. 2013) (addressing regulatory fees, which "support a regulatory regime governing those who pay the fee").

[180] *See Brown & Gay*, 461 S.W.3d at 124 n.7 ("[P]rivate parties . . . have an established means of protecting themselves from the specter of costly litigation—insurance.").

[181] *Hughes v. Tom Green County*, 573 S.W.3d 212, 220 (Tex. 2019).

[182] ERCOT admits, however, that although a "number of court cases have been brought against ERCOT arising out of the February 2021 extreme winter weather event," it "does not believe that the outcome of this litigation will affect its key functions." ELEC. RELIABILITY COUNCIL OF TEX. (ERCOT), SELF-EVALUATION REPORT: A REPORT TO THE TEXAS SUNSET ADVISORY COMMISSION 14 (Sept. 2021), https://www.sunset.texas.gov/public/uploads/files/reports/ERCOT%20SER_9-01-21.pdf.

ERCOT is not as indispensable to the legislative scheme as ERCOT suggests. As explained, PURA does not designate ERCOT as the ISO; it merely requires the power region to designate an organization to serve as the ISO and authorizes the PUC to certify that organization.[183] In fact, PURA provides that the PUC might certify "one or more" ISOs for the Texas power region and recognizes that an ISO may be decertified and replaced by a "successor organization."[184] Under PURA, *an ISO* may be critical to the State's oversight of the electricity industry, but ERCOT is not. Like the private university at issue in *Redus*, any expense ERCOT "incurs will fall on" ERCOT, "not the government or its taxpayers."[185]

The interplay between the exclusive-jurisdiction and sovereign-immunity doctrines provides further reason not to extend immunity to ERCOT. Sovereign immunity is not necessary to preserve "separation-of-powers principles"[186] and maintain an "equilibrium among the branches of government"[187]—the exclusive-jurisdiction doctrine serves that function here. The PUC's exclusive jurisdiction respects the Legislature's decision to provide the executive branch,

---

[183] *See* TEX. UTIL. CODE § 39.151(a), (c).

[184] *See id.* § 39.151(a), (d).

[185] *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 410 (Tex. 2020).

[186] *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

[187] *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 740-41 (Tex. 2019).

47

through the PUC, with "complete authority" over ERCOT.[188] It "honors the Legislature's intent that 'the appropriate body adjudicates the dispute' first, and thereby 'ensure[s] an orderly procedure to enforce those rights.'"[189] If litigation continues after the PUC has exercised its exclusive jurisdiction, any PUC fact findings would be given significant deference under the substantial-evidence rule.[190] And because the PUC applies its expertise in adjudicating issues first, litigation generally would not disrupt any key services without the PUC's first evaluating any complaint and determining ERCOT's continued fitness to serve as the ISO.[191] The PUC could determine whether decertification of ERCOT is appropriate and, if so, certify a successor ISO and transfer assets before any judicial litigation ensues.[192]

---

[188] TEX. UTIL. CODE § 39.151(d).

[189] *Clint Indep. Sch. Dist. v. Marquez*, 487 S.W.3d 538, 544 (Tex. 2016) (alteration in original) (quoting *Essenburg v. Dallas County*, 988 S.W.2d 188, 189 (Tex. 1998), and *City of Houston v. Rhule*, 417 S.W.3d 440, 442 (Tex. 2013)).

[190] TEX. UTIL. CODE § 15.001.

[191] The PUC also purports to protect ERCOT from liability by mitigating risks of unforeseen expenditures through promulgated rules. *See* 16 TEX. ADMIN. CODE §§ 25.200(d) (protecting ERCOT from liability "for its ordinary negligence" when it "cause[s] the interruption of transmission service for the purpose of maintaining ERCOT system stability and safety"), .361(c) ("ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures."); *cf. Rosenberg*, 571 S.W.3d at 751 (noting that "the statutory scheme itself contains provisions limiting liability and financial exposure" that prevent any "genuine risk of unforeseen expenditures").

[192] *See* TEX. UTIL. CODE § 39.151(d) ("The commission by rule shall adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the

Although we acknowledge that extending sovereign immunity to ERCOT could offer some benefits for the State's efforts to ensure a reliable and economical electricity grid, we must also "remain ever mindful" of sovereign immunity's costs.[193] Sovereign immunity from suit "allows the 'improvident actions' of the government to go unredressed"[194] and thus "places the burden of shouldering" the "costs and consequences" of those actions "on injured individuals," rather than the entity that caused those consequences.[195] In short, "just as immunity is inherent to sovereignty, unfairness is inherent to immunity."[196] Under these circumstances, the cost of authorizing such "unfairness" to protect a purely private, nonsovereign entity outweighs any benefits. We thus conclude that extending sovereign immunity to ERCOT would not promote the doctrine's purposes.

## IV. The Public's Trust

Finally, we must return to the concern over how the Court's decision will alter the public's trust in our State's justice system. The private corporation ERCOT, once unknown to the general public, has become a near-household name after more than 4.5 million people in

---

successor organization to ensure continuity of operations in the region."); 16 TEX. ADMIN. CODE § 25.364 ("Decertification of an Independent Organization").

[193] *See Rosenberg*, 571 S.W.3d at 751.

[194] *Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017).

[195] *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 121-22 (Tex. 2015).

[196] *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting).

Texas lost electric power during Winter Storm Uri.[197]  For every three Texans, two lost power "for an average of 42 hours, during which they were without power on average for one single consecutive bloc of 31 hours, rather than for short rotating periods."[198]  Not only did the storm expose needed improvements to the electric grid's reliability, but it also imposed a significant, tragic human toll:

> The Texas Department of State Health Services confirmed 246 deaths related to Winter Storm Uri, which included victims ranging from less than 1 year old to 102 years old. Hypothermia was the primary cause of the death for 161 people.  The storm and power outages also exacerbated pre-existing illnesses, leading to the deaths of 25 people like the 83-year old Katy resident who lost power to the respirator he needed to live. . . .  A grandmother and her three grandchildren likely numbered among the 10 Texans who died due to fires when attempts to warm their home ended in tragedy.[199]

---

[197] FED. ENERGY REGUL. COMM'N, N. AM. ELEC. RELIABILITY CORP., & REG'L ENTITIES, FERC, NERC AND REGIONAL ENTITY STAFF REPORT: THE FEBRUARY 2021 COLD WEATHER OUTAGES IN TEXAS AND THE SOUTH CENTRAL UNITED STATES 9 (Nov. 16, 2021), https://www.ferc.gov/media/february-2021-cold-weather-outages-texas-and-south-central-united-states-ferc-nerc-and.

[198] SUNSET ADVISORY COMMISSION, *supra* note 142, at 105 (quoting *Winter Storm 2021 and the Lifting of COVID-19 Restrictions in Texas*, UNIV. OF HOUS. HOBBY SCH. OF PUB. AFFS. (Mar. 25, 2021), https://uh.edu/hobby/winter2021/).

[199] *Id.*

Many lawsuits have already been filed against ERCOT based on damages resulting from the loss of electricity and the high wholesale prices ERCOT charged during Winter Storm Uri.[200]

The public expects and trusts that those injured can claim the protection of the laws and that those responsible—to the extent responsibility exists—will be held accountable: the government through the political process and at the ballot box[201] and private entities in court. But by granting sovereign immunity to a purely private entity that has not been designated as part of the government and without requiring a demonstration of the government's actual control over the complained-of conduct, the Court undermines this public trust.

The Legislature could, and in our opinion should, correct the Court's mistake. To specifically address the Court's holding as to ERCOT, the Legislature could waive ERCOT's newfound immunity in part or in full to give parties the right "to claim the protection of the laws, whenever he receives an injury."[202] More importantly, however, the Legislature could circumscribe this Court's broad and erroneous expansion of the sovereign-immunity doctrine to private entities. Although the judiciary defines sovereign immunity's boundaries,

---

[200] *See* ELEC. RELIABILITY COUNCIL OF TEX. (ERCOT), *supra* note 182, at 14.

[201] *See Univ. of the Incarnate Word v. Redus*, 602 S.W.3d 398, 411 (Tex. 2020) ("Political accountability is a vital counterweight to sovereign immunity's inequity.").

[202] *See Marbury v. Madison*, 5 U.S. 137, 163 (1803); *see also Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 435 (Tex. 2016) ("If immunity is applicable, *then* the judiciary defers to the legislature to waive such immunity.").

"[b]ecause the legislature 'can modify or abrogate common law rules,' provided its intent is clear, we consider legislative intent in establishing the doctrine's common-law contours."[203] To clarify its intent, the Legislature could enact a law—a rule of construction for Texas courts to apply—that it does not intend to grant private entities (including private corporations like ERCOT) the "nature, purposes, and powers" of an arm of the state for the purposes of sovereign immunity unless it expressly designates the entity as part of the government.

Although such a rule of construction would generally establish the outer limits to the judicial extension of sovereign immunity, a governmental designation by the Legislature ultimately may or may not be sufficient to demonstrate the necessary indications for the judiciary to conclude that a private entity is entitled to sovereign immunity. But that is how it should be. The rule of construction would begin restoring the public's trust that private entities will not be extended sovereign immunity as legislatively authorized entities unless the people's duly elected representatives expressly designate the entity as part of the government and the judiciary determines that the entity is entitled to sovereign immunity.

This legislative rule of construction, however, should not be necessary to cabin the judicial expansion of sovereign immunity. Although "immunity is inherent to sovereignty, unfairness is inherent

---

[203] *Redus*, 602 S.W.3d at 411 (footnote omitted) (quoting *Abutahoun v. Dow Chem. Co.*, 463 S.W.3d 42, 51 (Tex. 2015)).

52

to immunity,"[204] especially when it is extended to what is not inherently sovereign: purely private entities. We therefore respectfully dissent from the Court's decision to extend sovereign immunity to the private corporation ERCOT.

_____
Jeffrey S. Boyd
Justice


_____
John P. Devine
Justice

**OPINION FILED:** June 23, 2023

---

[204] *Id.* at 410-11 (quoting *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019)).